FILED
United States Court of Appeals
Tenth Circuit

**July 12, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellant,

v.

JOSEPH MARTINEZ,

      Defendant-Appellee.

No. 10-2070

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:09-CR-02439-JB-1)**

---

Laura Fashing, Assistant U.S. Attorney (Kenneth J. Gonzales, United States Attorney, with her on the briefs), Albuquerque, New Mexico, for Plaintiff-Appellant.

Samuel Bregman (Eric Loman on the brief) of Bregman & Loman, P.C., Albuquerque, New Mexico, for Defendant-Appellee.

---

Before **O'BRIEN**, **SEYMOUR**, and **EBEL**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

The United States appeals the district court's order granting Mr. Joseph Martinez's motion to suppress. The district court held that a warrantless search of Mr. Martinez's home was not justified by exigent circumstances because law enforcement officers did not have an objectively reasonable basis to believe there was a person inside his home who was in need of immediate aid. *United States v. Martinez* (*Martinez I*), 686 F. Supp. 2d 1161 (D.N.M. 2009).[1] We affirm.

**I.**

On April 14, 2009, the Bernalillo County Emergency Communication Center received a 911 call from Mr. Martinez's residence. The 911 dispatcher who received the call heard only static on the line. The dispatcher disconnected the call and placed a return call to the residence, but there was no answer and she again heard only static on the line. Sergeant Robert Lind and Deputy Nathan Kmatz of the Bernalillo County Sheriff's Office were dispatched to respond to the call.[2] The 911 call was not a priority call[3] for the sheriff's office, so the officers

---

[1] In the district court, Mr. Martinez filed two separate motions to suppress. *See infra* at 5-6. As a result, there are two district court decisions relevant to this appeal. In *United States v. Martinez* (*Martinez I*), 686 F. Supp. 2d 1161 (D.N.M. 2009), the court found the warrantless entry of Mr. Martinez's home was a violation of the Fourth Amendment. In *United States v. Martinez* (*Martinez II*), 696 F. Supp. 2d 1216 (D.N.M. 2010), the court suppressed Mr. Martinez's statements to law enforcement officials and the evidence seized during the subsequent warrant-based search of Mr. Martinez's home.

[2] According to the standard operating guidelines for the county

(continued...)

obeyed the speed limit and did not activate their lights or sirens while en route to the home.

The dispatcher told the officers that the 911 call had consisted only of static. Sgt. Lind knew that line problems or bad weather sometimes cause static-only telephone calls; officers within the department were generally aware of this fact as well. Approximately half of open-line *or* hangup 911 calls to which Sgt. Lind has been dispatched have involved emergencies.[4] Bernalillo County

---

[2](...continued)
communications center,

> If a 9-1-1 call results in a hang-up or is disconnected before the ECO [Emergency Communications Operator] can determine the reason for the call, the ECO will obtain the caller's number from the ANI display, dial that number to attempt to contact and inquire if an emergency exists. If a satisfactory answer is not received, or there is no answer, or if the line is busy, the ECO will dispatch the appropriate law enforcement agency to the location to check the welfare of the person(s) there and/or notify the appropriate agency.

*Martinez I*, 686 F. Supp. 2d at 1168 (quoting Bernalillo County Emergency Communications Center Standard Operating Guidelines § 7.2.10) (alteration in original).

[3] "Priority calls are ones that involve situations in which a person's life may be in immediate danger, such as felonies in progress, or when the 911 dispatcher hears screams or gunshots during the 911 call." *Martinez I*, 686 F. Supp. 2d at 1169.

[4] Although this was the first static 911 call to originate from Mr. Martinez's residence since 2000, it was not the last. "After the April 14, 2009 static 911 call, 911 dispatch received at least 8 more static 911 calls from [the home]." *Martinez I*, 686 F. Supp. 2d at 1177. Of course, this was not known to the officers on the day of the search.

sheriff's deputies responding to 911 calls do not distinguish between hangup calls and open-line static calls.

The responding officers arrived at Mr. Martinez's residence approximately twenty-six minutes after the 911 call was received. Mr. Martinez's two-story house is in a rural area, and it sits on a secluded lot. When the officers arrived, the gate to the property was closed, but they walked through an opening next to the gate. They repeatedly knocked on the front door and announced their presence, but they received no response. The officers inspected the perimeter of the house and looked into the windows. They saw no signs of forced entry and neither saw nor heard anyone inside. The officers then walked up an exterior staircase which led to a second-floor balcony. Off of the balcony, they found a closed but unlocked sliding glass door into the house. Through the glass, they could see some electronics boxes near the door and they noticed that the house looked disheveled. The officers opened the sliding glass door and again announced their presence. They received no response.

The officers entered through the unlocked door and conducted a sweep of the house "to ensure no one was injured, unconscious, or deceased." *Id.* at 1171. During their search, they saw drugs and drug paraphernalia in plain view, as well as pornography that appeared to depict minors, but they did not find anyone

-4-

inside.[5] "Once the officers ensured no one inside the residence needed emergency assistance, the officers promptly exited the residence and secured the house." *Id.* at 1174. They spent approximately five minutes inside.

After the search was complete, but while law enforcement officials were still on the property, Mr. Martinez arrived home. He was taken into custody, advised of his *Miranda* rights, and agreed to speak with a detective. The officials used information from the warrantless entry and Mr. Martinez's subsequent admissions while in custody to secure a search warrant for the property. Evidence seized during the search formed the basis of the criminal charges against Mr. Martinez.

Mr. Martinez filed motions to suppress the evidence seized from his home and the statements he made to officials. In two separate opinions, the district court first found that the initial warrantless search of Mr. Martinez's home was unconstitutional because it was not justified by the exigent-circumstances exception to the warrant requirement. It also concluded that the search warrant was nonetheless supported by probable cause due to Mr. Martinez's statements to detectives. *See Martinez I*, 686 F. Supp. 2d at 1197, 1200-02. In the second decision, it found that the taint of the illegal search was not attenuated at the time Mr. Martinez made his confession and his statements were therefore fruit of the

---

[5] The parties disagree on whether the pornography was found in plain view. The resolution of this issue is not necessary for our disposition.

poisonous tree. The district court suppressed Mr. Martinez's statements and the evidence seized during the search of his home. *See United States v. Martinez* (*Martinez II*), 696 F. Supp. 2d 1216, 1248, 1263 (D.N.M. 2010).

On appeal, the government does not challenge any of the district court's factual findings. Rather, it contends the warrantless search of Mr. Martinez's home was reasonable because exigent circumstances justified the officers' entry. It claims the district court incorrectly determined that the officers responding to the static 911 call did not have a reasonable basis to believe that someone inside the house needed emergency aid or assistance.[6]

## II.

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotation marks omitted). "[W]arrants are generally required to search a person's home or his person unless the 'exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978). One such

---

[6] The government also contends the scope and manner of the warrantless search was reasonable – an issue that was not reached by the district court. Because we agree with the district court on the first issue, we need not reach the second one.

exigency "obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). "Thus, law enforcement officers 'may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" *Michigan v. Fisher*, 130 S. Ct. 546, 548 (2009) (per curiam) (quoting *Brigham City*, 547 U.S. at 403).

The government bears the burden of proving that exigent circumstances rendered a warrantless search reasonable. *United States v. Anderson*, 154 F.3d 1225, 1233 (10th Cir. 1998). "That burden is especially heavy when the exception must justify the warrantless entry of a home." *United States v. Najar*, 451 F.3d 710, 717 (10th Cir. 2006). Under *Brigham City*, we use a two-part test to determine whether a warrantless search was justified by the risk of personal injury. We consider "whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable . . . ." *Id.* at 718. The emergency aid exception depends on "an objectively reasonable basis for believing that a person within the house is in need of immediate aid," not on an officer's subjective belief. *Fisher*, 130 S. Ct. at 548 (citing *Brigham City*, 547 U.S. at 404-05) (citations, alteration, and internal quotation marks omitted). In our review, "we are guided by the realities of the situation presented by the record. We should evaluate the circumstances as they

would have appeared to prudent, cautious, and trained officers." *United States v. Davis*, 290 F.3d 1239, 1243 (10th Cir. 2002) (internal quotation marks omitted).

"The existence of exigent circumstances is a mixed question of law and fact." *United States v. Anderson*, 981 F.2d 1560, 1567 (10th Cir. 1992). Our review typically "entails a determination whether the district court's factual findings are clearly erroneous, viewing the evidence in the light most favorable to the district court's findings." *Najar*, 451 F.3d at 717. "The ultimate question regarding the reasonableness of the search is a question of law which we review *de novo*." *Id.* (internal quotation marks omitted). In this case, the government does not challenge the district court's findings of fact, so our only question is whether the search, given the facts found by the district court, was reasonable under the Fourth Amendment.

The government contends the officers' warrantless search was justified by exigent circumstances because the officers had an objectively reasonable belief that someone inside the house needed immediate aid or was in danger. It emphasizes four facts to support its position: (1) the static-only 911 call from the residence; (2) the "disheveled" appearance of the house; (3) the unlocked door on the backside second floor of the house; and (4) the electronics boxes just inside the unlocked door.

The district court explained that a static 911 call is insufficient to create an objectively reasonable belief that someone inside the home is in need of aid. We

agree. Although the sheriff's department does not distinguish between hangup calls and static calls to 911, the two types of calls differ in a fundamental way. At the very least, "911 hang-ups inform the police that someone physically dialed 9-1-1 . . . and either hung up or was disconnected before he or she could speak to the operator. An unanswered return call gives further information pointing to a probability . . . that after the initial call was placed the caller or the phone has somehow been incapacitated." *Johnson v. City of Memphis*, 617 F.3d 864, 871 (6th Cir. 2010). With a static 911 call, however, there is no such assurance that a person initiated the call. As the district court found, "[t]hat an electrical or weather anomaly can cause such calls – and, more importantly, that it is common knowledge among officers and 911 dispatchers that electrical or weather anomalies can cause such calls – decreases the probative value of the call in this case." *Martinez I*, 686 F. Supp. 2d at 1194.

In *Najar*, we noted the important role 911 calls – including 911 hangup calls – play in communicating emergencies. *See* 451 F.3d at 719-20. We recognized, as have other courts, that "911 calls are the predominant means of communicating emergency situations." *Id.* at 719 (internal quotation marks omitted). But we also expressly *did not* hold "that a response to a 911 call will always justify a warrantless entry upon the arrival of law enforcement." *Id.* at 720 n.7. Although in Bernalillo County approximately half of hangup 911 and static 911 calls *combined* involve emergencies, this fact provides no indication of

how frequently static 911 calls involve emergencies – or even how frequently they are initiated by a person. A static 911 call, which conveys even less information than a hangup call, cannot justify warrantless entry by police with no substantiating evidence of danger, injury, or foul play.

Nor do the messy state of the house, the electronics boxes, and the unlocked balcony door add much to the equation. Mr. Martinez's house was in a rural area, where an unlocked balcony door should not necessarily arouse suspicion. And the district court found that, although the house was "untidy, the house did not appear ransacked or as if a struggle[] had occurred." *Martinez I*, 686 F. Supp. 2d at 1170. Some households are tidy, others are not. A person's failure to keep an orderly home should not subject him or her to a warrantless search by police.

The differences between this case and *Najar*, 451 F.3d 710, are informative. In *Najar*, police dispatch received a silent 911 call early one morning that was disconnected. Dispatch made several attempts to reach the caller, and each "call was answered but quickly disconnected without a word." *Id.* at 712. When police arrived at the home, the lights were on and a person could be seen and heard inside the home, but despite officers' repeated knocks on the door, no one responded. *Id.* at 716. The officers also asked the dispatcher to try to call the house again, and they were close enough to hear the phone ringing inside. *Id.* Police therefore knew both that someone inside the house had placed

a call to 911 and that someone in the house was reluctant to talk to police. Once the defendant finally answered the door, he denied making a 911 call and also claimed no one else was in the house. *Id.* We concluded that exigent circumstances justified the police's entry into the home without a warrant because "the officers had reasonable grounds to believe someone inside the trailer may have been in need of emergency aid and immediate action was required." *Id.* at 720.

Unlike *Najar*, the 911 call in this case was a static call, not a hangup call. The dispatcher's return calls to the house also encountered static on the line, suggesting there was a line problem. Furthermore, when the officers arrived, they saw no evidence indicating anyone was in the house, much less anyone in need of immediate assistance. We agree with the district court that under all of the facts known to the officers, they had insufficient information to objectively support a reasonable belief that someone inside the house was in need of aid.

The government also contends the officers had an objectively reasonable belief that there was a burglary in progress at the house. The government did not make this argument in its briefs to the district court. Its occasional references to a possible burglary during the suppression hearing were to suggest that a burglary may have caused a person inside the home to be in need of aid or assistance. Accordingly, the district court did not separately address whether the officers had an objectively reasonable basis to believe they had interrupted a burglary in

-11-

progress.  We will not consider a suppression argument raised for the first time on appeal absent a showing of good cause for why it was not raised before the trial court.  *United States v. Burke*, 633 F.3d 984, 988 (10th Cir. 2011).  We will, however, consider the burglary argument to the extent that it supports the possibility that there was an individual in the home who was in need of assistance.

The United States relies heavily on cases in which the activation of home alarms helped to create exigent circumstances for police to enter the home, but only one of these cases, *United States v. McCullough*, 457 F.3d 1150 (10th Cir. 2006), is binding authority on our court.  Yet the facts of *McCullough* are entirely distinguishable from those that occurred here.  In *McCullough*, the alarm at the defendant's house had activated and an individual answering the residence's telephone did not know the security code for the alarm, which suggests an unauthorized person was in the house.  *See id.* at 1156.  Moreover, when police arrived the officer "was confronted with two people who were unusually dirty in appearance, did not have any form of personal identification, were admittedly not the homeowners, did not know the name of the homeowner, and were acting in a nervous manner.  Further, one of the two people . . . was observed leaving the residence," did not speak, and acted "disoriented."  *Id.* at 1164.  Thus, although the home alarm initially drew police to the house, there were plenty of substantiating facts to create an objectively reasonable belief that a burglary was

in progress at the house.

Here, however, the officers saw no evidence that unauthorized individuals were in the house – or that anyone was in the house at all. The officers did not hear or see anyone in or near the house, they saw no signs of forced entry, they saw no cars near the house, and the gate to the property was closed. None of the officers' observations created a reasonable belief that there was an emergency inside the home. Thus, *McCullough* is inapposite.

We are similarly unpersuaded by the government's reliance on home alarm cases from our sister circuits. *See, e.g.*, *United States v. Brown*, 449 F.3d 741 (6th Cir. 2006); *United States v. Tibolt*, 72 F.3d 965 (1st. Cir. 1995). Simply put, a home alarm and a static 911 call are not the same. At the very least, a homeowner chooses to install and engage such an alarm, and does so with the understanding that the security company may alert the police and ask them to investigate. In contrast, a static 911 call requires no act on the homeowner's part whatsoever, and dispenses no agency authority.

The government also claims the district court erroneously held the officers to a higher standard than "reasonable belief." In particular, it points to the district court's repeated statements that the "evidence was in equipoise," *see Martinez I*, 686 F. Supp. 2d at 1193-94, and argues this is a probable cause standard.

The government correctly observes that "reasonable belief" is a lower

-13-

standard than probable cause. *See United States v. Porter*, 594 F.3d 1251, 1258 (10th Cir. 2010) ("Reasonable belief does not require absolute certainty; the standard is more lenient than the probable cause standard."). But the government is incorrect when it claims the district court applied the wrong standard. We read the district court opinion not as saying the evidence created a 50% chance that there was an emergency. Rather, the district court was explaining that the evidence was *neutral* and did not support an objectively reasonable belief there was any emergency in the house. *See, e.g.*, *Martinez I*, 686 F. Supp. 2d at 1194 ("Again, the evidence was in equipoise. It does not point clearly in one way or another."). The burden of proof was on the government to establish that exigent circumstances justified a warrantless search, and this "burden is especially heavy when the exception must justify the warrantless entry of a home." *Najar*, 451 F.3d at 717. The district court's determination that the government's proffered evidence failed to meet this burden was proper under the circumstances here.

The government also argues the district court inappropriately relied on the officers' subjective beliefs when determining whether the warrantless search was reasonable. This mischaracterizes the district court opinion. The district court made findings as to the subjective beliefs of the officers. *See, e.g.*, *Martinez I*, 686 F. Supp. 2d at 1169 ("The officers did not have a subjective belief that anyone at 10 Dairy Lane was in immediate need of protection."); *id.* at 1171 ("The officers did not have a subjective belief that anyone in the house was in

immediate need of assistance; rather, the officers could not eliminate the possibility that someone was in the house who needed immediate assistance."). But the court clearly understood that it is objective reasonableness, not subjective beliefs, that governs our Fourth Amendment analysis. *See id.* at 1182 ("The standard for determining whether entry was justified is one of objective reasonableness – the officers' subjective intent is not controlling." (citing *Brigham City*, 547 U.S. at 404)); *see also id.* at 1190 ("[T]he officers did not have an *objectively reasonable basis* for believing that there was an immediate need to protect the lives or safety of someone in Martinez'[s] home . . . .") (emphasis added)).

The findings and discussion of the officers' subjective beliefs were used by the district court simply to illustrate what it interpreted as an attempt by the government to shift the burden in this case. As the court explained, although the officers lacked a subjective belief that someone in the house was in need of immediate assistance,

> the officers believed that they could not eliminate the possibility that someone in the house needed immediate assistance. Repeatedly in argument and examinations, [Assistant U.S. Attorney] Rees would talk about whether certain facts convinced the officers that an emergency did *not* exist. . . . The form of Ms. Rees' questioning reflects a shift of the burdens in this case – an approach similar to that which the officers used. The United States appears to assert that, in applying the exigent-circumstances exception to the warrant requirement, a 911 call creates a possibility that someone inside the residence requires immediate protection or aid, and that the officers are justified in entering unless and until they are somehow able to

dispel that possibility.

*Id.* at 1195-96.

The sanctity of the home is too important to be violated by the mere possibility that someone inside is in need of aid – such a "possibility" is ever-present. It is for this reason that exceptions to the Fourth Amendment's warrant requirement are "subject only to a few specifically established and well-delineated exceptions." *Mincey*, 437 U.S. at 390 (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)) (internal quotation marks omitted). The district court understood the law and properly applied it in this case.

Finally, the government claims the district court erred by relying "on its own experience rather than deferring to the officers' experience." Aplt. Br. at 37. The government's argument is unpersuasive. The district court need not jettison all common sense when reviewing the evidence. It need only consider the evidence from the viewpoint of a "prudent, cautious, and trained officer[]." *Najar*, 451 F.3d at 719. We are satisfied the district court did so.

Because the officers lacked a reasonable basis for believing an individual inside Mr. Martinez's home was in need of immediate aid or assistance, we agree with the district court's determination that the warrantless search of Mr. Martinez's home was a violation of the Fourth Amendment.

Accordingly, we **AFFIRM**.