# IN THE SUPREME COURT, STATE OF WYOMING

## 2014 WY 156

OCTOBER TERM, A.D. 2014

*December 8, 2014*

CALEB AARON CAMPBELL,

Appellant
(Defendant),

v.                                                      S-14-0049

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Albany County*
*The Honorable Jeffrey A. Donnell, Judge*

*Representing Appellant:*
    Linda E. Devine, Devine Law, Laramie, Wyoming

*Representing Appellee:*
    Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Jenny L. Craig, Senior Assistant Attorney General; Abigail C. Boudewyns, Assistant Attorney General.  Argument by Ms. Boudewyns.

*Before BURKE, C.J., and HILL, KITE, DAVIS, and FOX, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**DAVIS**, Justice.

[¶1]   Appellant Caleb Campbell entered a conditional guilty plea to felony possession of marijuana, reserving his right to appeal the district court's denial of his motion to suppress evidence under Wyoming Rule of Criminal Procedure 11(a)(2).  We remand to the district court for further consideration of that motion in accordance with this opinion.

## ISSUES

[¶2]   Campbell raises three questions relating to his underlying claim that police officers obtained evidence against him in violation of his rights under the Fourth Amendment to the United States Constitution.[1]  We restate and reorder those questions as follows:

1.   Did the initial entry into Appellant's home fall within the "emergency assistance" exception to the Fourth Amendment's warrant requirement?

2.  Did Appellant voluntarily consent to the search of the bedrooms and bathrooms in his home?

3.  If the initial entry into Appellant's home violated the Fourth Amendment, did that illegality impermissibly taint any consent to a later search?

## FACTS

[¶3]   On February 24, 2013, the Laramie Police Department received a telephone call from Shannon Homolka, who asked that an officer check on her son, Sean.  She had not heard from him for several weeks.[2]  Sergeant Austin and a patrol officer were dispatched to the apartment building that was the young man's last known residence.  They observed interior coverings on the windows of the apartment and saw footprints in the snow at the entrance.  Lights were on inside, and when the officers stepped to the door, they could hear a television and the barking of what they perceived to be an excited dog.  No one responded when Sergeant Austin knocked and rang the doorbell.

[¶4]   Austin tried the door and found that it was unlocked, opened it approximately two to three feet, called out for Sean Homolka, and identified himself as a police officer.  He

---

[1] Campbell also asserts that the challenged police conduct violated the parallel provisions of the Wyoming Constitution.  However, because he has failed to provide any independent analysis of his claims under the state constitution, this Court will consider only claims under the Fourth Amendment. *Rideout v. State*, 2005 WY 141, ¶ 15, 122 P.3d 201, 205 (Wyo. 2005).

[2] Although the record does not say as much, we infer that none of Sean's family lived in the Laramie area.

saw a blue glass bong[3] on a counter top that separated the apartment's living room and kitchen. When no one answered or appeared, he closed the door, knocked on it, rang the bell a few more times, and then decided to phone Ms. Homolka to obtain more information.

[¶5]   She informed him that she had not spoken to her son since mid-November of 2012, and that a gift sent to him by his grandparents had been returned because he failed to pick it up from the post office. She had phoned Campbell, who shared the apartment with her son, but he refused to give her any information about Sean or his whereabouts. She suggested that the sergeant might find Campbell at the local Pizza Hut where he and her son had worked together.

[¶6]   The officers proceeded to the restaurant, where they encountered a young man who told them he had been snowboarding with Sean Homolka earlier that day, and that Campbell was expected to return shortly from a pizza delivery. When Campbell arrived, he told the officers that Homolka had moved to Casper, but that he was visiting Laramie and staying at Campbell's apartment at the time. Sergeant Austin mentioned that he had seen bongs in the apartment and cautioned Campbell to "clean up his act" and get rid of them, but he also advised him that they intended to overlook that violation and that they only wanted to speak to Homolka about his mother's concerns. Campbell agreed to get in touch with Homolka, and the officers asked Campbell to meet them with Homolka at the apartment.

[¶7]   When the officers reached the apartment, Campbell met them on the sidewalk and told them Homolka would arrive shortly. Sergeant Austin asked him if he had gotten rid of the drug paraphernalia. Campbell said that he had, retrieved a white trash bag, and broke its contents in front of the officers. However, when Austin examined the contents, he saw no trace of the blue glass bong that had been in the apartment and asked Campbell about it. Campbell became nervous, told the sergeant he had not been completely honest, brought that bong outside and broke it. Sergeant Austin then asked if he had anything else, and when Campbell said he had a little marijuana, Austin asked, "Want to get rid of it?" Campbell responded affirmatively and, from Sergeant Austin's vantage point just outside the open apartment door, appeared to take the drug to the bathroom and flush it down the toilet.

[¶8]   The sergeant asked if he could enter the apartment to confirm that Campbell had gotten rid of everything, assuring him that this was his only concern and that he did not want to charge Campbell with anything. Campbell consented to the entry and to an examination of an unused bedroom and its attached bathroom. This occurred

---

[3] A bong is a pipe-like device often used to smoke marijuana. As the user inhales through an opening in the device, smoke is drawn from its bowl through a water-filled chamber, thereby filtering and cooling the smoke.

approximately thirty minutes after the sergeant had first opened the front door and observed the blue bong. Austin found nothing in either room, but he saw still more bongs in another adjoining bedroom through an open door. Campbell consented to a search of that room, but despite the sergeant's reassurances that he did not intend to charge him with anything, continued to display what Austin viewed as undue nervousness.

[¶9]  When Sergeant Austin then inquired about looking into two bedrooms and a bathroom on the opposite end of the apartment, Campbell at first denied him permission to do so. Austin grew frustrated by Campbell's repeated deceit in the face of his expressed lack of interest in prosecuting him, and he indicated that he should perhaps just go and get his ticket book after all. Campbell then said something to the effect that, "You'll find it anyway," and told Austin he could search the remaining rooms.

[¶10] The officers discovered a psilocybin mushroom-growing and dehydration operation inside of one of the bedrooms. A subsequent search of the kitchen, to which Campbell agreed, found over three ounces of marijuana. Campbell admitted that he had been extracting THC from marijuana and that he had been selling psilocybin mushrooms. The officers obviously could not overlook criminal conduct of this magnitude.

[¶11] On March 8, 2013, the State charged Campbell with four felonies: manufacturing psilocybin, possessing psilocybin with the intent to distribute it, possessing marijuana with the intent to distribute it, and felony possession of marijuana.[4]  Following his arraignment on May 21, the district court set trial for September 19, 2013. On June 17 and June 20, 2013, Campbell filed a motion and an amended motion to suppress evidence and dismiss the case.

[¶12] Campbell argued that when Sergeant Austin first opened the front door to his apartment and peered inside, he conducted an impermissible warrantless search of the constitutionally protected area of his residence. Anticipating that the State would attempt to justify that conduct under the "community caretaking" exception to the Fourth Amendment's warrant requirement, he also argued that exception did not apply, and that all evidence gathered should be excluded as the tainted fruit of the initial unlawful search. Finally, Campbell argued that his consent to Sergeant Austin's second entry into his apartment and his search of various rooms in the apartment was involuntary.

[¶13] The State responded that the sergeant's initial intrusion into Campbell's home was justified by either of two related exceptions to the warrant requirement—the "community caretaking" and the "emergency assistance" exceptions. The State also argued that Campbell voluntarily consented to Sergeant Austin's later entry into and search of the apartment, and that this consent removed any taint attributable to the initial entry,

---

[4] Possession of more than three ounces of marijuana is a felony carrying a penalty of not more than five years imprisonment. Wyo. Stat. Ann. § 35-7-1031(c)(i)(A) and (iii) (LexisNexis 2013).

because it served as a lawful and independent source of the evidence eventually discovered.

[¶14] The district court held a hearing on the suppression motion on July 31, 2013, and it issued a decision letter denying the motion six days later. Relying on *Moulton v. State*, 2006 WY 152, 148 P.3d 38 (Wyo. 2006), the district court concluded that the emergency assistance exception permitted the initial intrusion into Campbell's home. After reviewing the DVD recording of Sergeant Austin's later interaction with Campbell, the court also concluded that there was no coercion, and that consequently Campbell's consent to enter and search the apartment was voluntary. Because of its ruling on the emergency assistance exception, the district court did not consider whether the initial entry may have tainted any evidence thereafter discovered even if Campbell's consent was voluntary.

[¶15] After the motion to suppress was denied, Campbell entered into a plea agreement with the State. It required him to plead guilty to the charge of possessing a felony quantity of marijuana, in exchange for which the State agreed to dismiss the three remaining charges, recommend probation at sentencing, and allow the guilty plea to be entered conditionally so that Campbell could appeal the denial of his motion to suppress. The district court accepted the agreement and Campbell's conditional guilty plea, and it sentenced him to a term of two to five years of incarceration, which it suspended in favor of three years of supervised probation. Campbell timely perfected this appeal.

## DISCUSSION

### The Initial Entry and the Emergency Assistance Exception

[¶16] The Fourth Amendment to the United States Constitution protects "the right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures." U.S. Const. amend. IV. As the United States Supreme Court has observed, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. U.S. Dist. Court for East. Dist. of Mich. So. Div.*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972).

[¶17] Warrantless searches and seizures are per se unreasonable unless justified by probable cause or established exceptions. *Moulton*, ¶ 16, 148 P.3d at 43. The parties have mentioned both the community caretaking exception and the emergency assistance exceptions to the warrant requirement at various times in this case. Both find their roots in the United States Supreme Court decision in *Cady v. Dombrowski*, 413 U.S. 433, 441-42, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973), which actually involved an inventory search. *State v. Vargas*, 63 A.3d 175, 182-83, 187-88 (N.J. 2013).

4

[¶18]  We will touch on the community caretaking exception briefly, although it does not apply here.  It pertains to police encounters with citizens in public places and in their vehicles under circumstances giving rise to concerns about their welfare or safety, even though the circumstances do not present an emergency.  *Id*.  In such cases, law enforcement may to a limited extent intrude on a citizen's privacy if there is an articulable threat to public safety that the officer believes he must address.

[¶19]  We have applied the community caretaker exception in cases which did not involve entry into homes.  *Wilson v. State*, 874 P.2d 215, 221 (Wyo. 1994) (officer justified in pulling his patrol car over to the curb and contacting defendant, who was limping and might be in need of assistance); *Bloomquist v. State*, 914 P.2d 812, 821-22 (Wyo. 1996) (continued questioning of defendant justified under the exception to try to determine whether there was an additional injured passenger); *Morris v. State*, 908 P.2d 931, 935-36 (Wyo. 1995) (deputies were justified by the exception in escorting an unsteady and disoriented citizen to the sheriff's office so that he could call for a ride, but not in examining his wallet, which had been misplaced in a patrol car).

[¶20]  On the other hand, the emergency assistance exception[5] allows entry into homes.  However, due to the much greater expectation of privacy traditionally accorded the home, a higher standard must be met to permit use of evidence discovered by the entry without a warrant.  *Vargas*, 63 A.3d at 188.  Evidence found after warrantless entry into a residence is admissible only if the officer who enters has a reasonable belief that there exists an emergency requiring immediate action to assist citizens or to prevent harm to persons or property in the residence.  As the Supreme Court of New Jersey has explained:

> Under the emergency-aid doctrine, a police officer can enter a home without a warrant if he has an objectively reasonable basis to believe that an emergency requires that he provide immediate assistance to protect or preserve life, or to prevent serious injury and there is a reasonable nexus between the emergency and the area or places to be searched. In other words, if police officers possess an objectively reasonable basis to believe that prompt action is needed to meet an imminent danger, then . . . the Fourth Amendment . . . [does not] demand that the officers delay potential lifesaving measures while critical and precious time is expended obtaining a warrant. Indeed, the rationale of the emergency-aid exception is informed in large measure by the community-caretaking responsibilities of government officials, as

---

[5] In some cases, the emergency assistance exception is referred to as part of the community caretaker exception.  *See, e.g., Vargas,* 63 A.3d at 186.

explained by Judge (later Chief Justice) Burger in *Wayne v. United States* [318 F.2d 205, 212 (D.C. Cir. 1963)]:

> A warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.

*Vargas*, 63 A.3d at 188 (internal citations and quotation marks omitted); *see also United States v. Bute*, 43 F.3d 531, 539 (10th Cir. 1994). Courts generally limit the emergency assistance exception to cases in which the officer acts to preserve life or prevent serious injury believing that there is a genuine emergency. Therefore, to justify use of the exception, the government must show that the officer had a reasonable and articulable belief that immediate aid or assistance was required to prevent serious harm to persons or property. *Id.*; *see also State v. Ryon*, 108 P.3d 1032, 1042-44 (N.M. 2005).

[¶21] The New Mexico Supreme Court clearly and cogently explained the relationship between the community caretaking and the emergency assistance doctrines as they apply to searches of a home:

> The emergency doctrine applies to, but is not limited to, warrantless intrusions into personal residences. The *Cady* community caretaker or public servant doctrine deals primarily with warrantless searches and seizures of automobiles, and the officer might or might not believe there is a difficulty requiring his general assistance. Since there is a lesser privacy expectation in a vehicle on a public highway, an involuntary search or seizure there is judged by a lower standard of reasonableness: a specific and articulable concern for public safety requiring the officer's general assistance. The emergency assistance doctrine, which may justify more intrusive searches of the home or person, must be assessed separately by a distinct test. Since the privacy expectation is strongest in the home only a genuine emergency will justify entering and searching a home without a warrant and without consent or knowledge.

*Ryon*, 108 P.3d at 1043 (internal citations and quotation marks omitted).

[¶22] The only exception potentially applicable to Sergeant Austin's entry into Appellant's home is therefore the emergency assistance or aid exception. The district

court correctly analyzed this case only under that exception. However, a review of the record leaves us with the conviction that it nonetheless applied an improper legal standard when it determined that the emergency assistance exception alone permitted the use of evidence obtained after Sergeant Austin's initial entry into Campbell's apartment. To be fair, the district court appears to have based its decision on a not-altogether unreasonable reading of our opinion in *Moulton*. However, as with any other question of law pertaining to constitutional search and seizure issues, we review the propriety of the test applied by the district court *de novo*. *Moulton*, ¶ 13, 148 P.3d at 42.

[¶23] In *Moulton*, officers entered the defendant's home in Glendo because his wife, an emergency medical technician, contacted a law enforcement dispatcher at 4:30 a.m. on a hand-held radio. She identified herself by using her medic's call sign, and her recorded voice conveyed a sense of urgency. The rest of the transmission was garbled. Officers were concerned that she had encountered an emergency situation requiring police assistance, and they tried to contact her by phone. When they could not, they went to her home. Knocking on the door and ringing the doorbell failed to rouse anyone, and so they entered the home to see if anyone was inside. That brief search yielded two pieces of information. First, a daughter roused from sleep indicated that her mother and father might be at the "lake." Second, when officers peered into a bedroom they saw psilocybin mushrooms grown by the defendant. The officers then left and searched for Mrs. Moulton at the lake for several hours. *Id.*, ¶¶ 3-6, 148 P.3d at 40.

[¶24] In concluding that the search of the Moulton home fell within the emergency assistance exception, we said that the exception applies when an officer has a reasonable belief that another's life or safety might be in peril. *Id.*, ¶ 18, 148 P.3d at 43. This was the test applied by the district court in this case.

[¶25] It is evident that this expression of the test is incomplete and does not satisfy the standard set out above, because it does not include the requirement that an officer must reasonably believe that he faces a genuine emergency to which he must respond. Elsewhere in *Moulton*, we repeatedly stressed that, at 4:30 a.m., an emergency medical technician using the means usually employed when operating in her professional capacity made an urgent-sounding but garbled call for assistance to a police dispatcher, and that she could not thereafter be contacted. *Id.*, ¶¶ 20-21, 148 P.3d at 44. Our intent to confine the application of this exception to cases reasonably said to involve "genuine emergencies requiring immediate assistance" has been more plainly stated in decisions issued both before and after *Moulton*. *Owens v. State*, 2012 WY 14, ¶ 11, 269 P.3d 1093, 1096 (Wyo. 2012); *Ortega v. State*, 669 P.2d 935, 941 (Wyo. 1983), *overruled on other grounds by Jones v. State*, 902 P.2d 686 (Wyo. 1995).

[¶26] There was no evidence of such an emergency in this case. The officers went to the last known address of a young man who had not spoken to his mother in several weeks. As distressing as that lack of communication might be to a parent, it falls far short of an

emergency or a basis to believe that he required immediate aid. Given the likelihood that some people leave their televisions turned on as a deterrent to would-be intruders, and that they may also leave their dogs in the house when they depart for brief periods, those facts likewise do not suggest an immediate emergency. Simply stated, Sergeant Austin testified to no articulable facts supporting a claim that he reasonably and objectively believed that he and his fellow officer were dealing with a serious emergency that required their immediate entry into Campbell's apartment. Consequently, the emergency assistance exception does not apply. To hold otherwise on the facts of this case would require us to adopt a rule which would render Fourth Amendment protection of the home meaningless.

[¶27] Because there was no emergency when Sergeant Austin opened the door to Campbell's apartment, that entry was an unlawful search in violation of the Fourth Amendment.

**The Voluntariness of Campbell's Consent to Later Searches**

[¶28] However, the fruits of the search would still have been admissible at trial if the later search was voluntarily consented to and sufficiently separated from the unlawful entry to be untainted by it. To determine whether it was or not, we first determine if the district court's decision that Appellant voluntarily consented to the search was error. Whether consent is voluntary is a question of fact, and the State bore the burden of proving voluntariness by a preponderance of the evidence. *O'Boyle v. State*, 2005 WY 83, ¶ 60, 117 P.3d 401, 417-18 (Wyo. 2005). We will not disturb a district court's resolution of that factual issue unless, viewing the evidence in the light most favorable to the district court's decision, we conclude that it is clearly erroneous. *Id.*, ¶ 18, 117 P.3d at 407. A consent to search is voluntary to the extent that it was not obtained by police coercion as determined by viewing the totality of the circumstances. Those circumstances may include the way in which an officer phrased his request to search, his demeanor, whether the defendant was informed that he could refuse the request, and the presence or absence of threatening behavior or other coercive factors. *Burgos-Seberos v. State*, 969 P.2d 1131, 1134 (Wyo. 1998).

[¶29] The only record we have of Campbell's interaction with Sergeant Austin is the sergeant's testimony at the suppression hearing. A DVD recording of that interaction captured by a personal camera on Sergeant Austin's person was submitted to and reviewed by the district court, but Campbell did not designate that recording as part of the appellate record. Where evidence considered by a trial court is not designated, we assume that it supported a decision rendered in reliance upon it. *See Waggoner v. General Motors Corp.*, 771 P.2d 1195, 1198 (Wyo. 1989).

[¶30] After reviewing Sergeant Austin's testimony and assuming that the contents of the DVD provided additional support for the court's ruling, we conclude that the district

8

court's finding that Campbell's consent was not the result of police coercion was not clearly erroneous.

**Taint from the Initial Unlawful Search of the Apartment**

[¶31]  Although Campbell's consent may have been voluntary, that alone does not mean that evidence recovered in reliance upon it should not be suppressed as the tainted fruit of Sergeant Austin's initial intrusion into his apartment.  When a consensual search follows a Fourth Amendment violation, the government must prove not only that the defendant's consent was voluntary in the sense that his will was not overborne by police coercion, but also that pressures resulting from the initial constitutional violation had diminished and were no longer so great as to prevent him from acting with a degree of free will sufficient to purge his consent of the taint of that violation.  4 Wayne R. LaFave, *Search and Seizure* § 8.2(d) (5th ed. 2012, updated 2014);[6] *United States v. Melendez-Garcia*, 28 F.3d 1046, 1053-54 (10th Cir. 1994).

[¶32]  This second inquiry focuses on whether there was a sufficient break between the initial illegality and any evidence thereafter obtained.  It requires a determination of whether evidence was obtained by exploiting the primary illegality, or whether it was instead obtained by means sufficiently distinguishable to purge the primary taint.  *Id.*; *United States v. Fox*, 600 F.3d 1253, 1257 (10th Cir. 2010).  Three factors are particularly relevant to that inquiry: the temporal proximity between the Fourth Amendment violation and the consent to search, the presence of intervening circumstances, and the purpose and flagrancy of the police conduct that violated the Fourth Amendment.  *Melendez-Garcia*, 28 F.3d at 1054; *O'Boyle,* ¶ 61, 117 P.3d at 418; *Campbell v. State*, 2004 WY 106, ¶ 14, 97 P.3d 781, 785 (Wyo. 2004).

[¶33] Only the third factor seems to clearly favor the State.  The record strongly suggests that Sergeant Austin opened Campbell's apartment door in a well-intentioned effort to better serve the public, and that he minimized his intrusion into the apartment.[7]  The weight to be given the thirty-minute time lapse between that initial intrusion and the

---

[6] As LaFave observed:

> While there is a sufficient overlap of the voluntariness and fruits tests that often a proper result may be reached by using either one independently, it is extremely important to understand that (i) the two tests are not identical, and (ii) consequently the evidence obtained by the purported consent should be held admissible only if it is determined that the consent was *both* voluntary and not an exploitation of the prior illegality.

4 LaFave, *supra*, § 8.2(d).

[7] Ironically, the minimal intrusion tends to belie the notion that he may have reasonably believed he was responding to an emergency.

later consensual entry is less clear, as is the question of whether circumstances intervening between the initial entry and the consent interrupted the causal link so that the former no longer tainted Campbell's consent. The record suggests that during that thirty-minute period, Sergeant Austin may perhaps have exploited the information he obtained through the initial intrusion by revealing it to Campbell, and that he could therefore have influenced Campbell's decision to consent through its use. Sergeant Austin's statements to Campbell about the bongs may have led him to agree to meet the officers at the apartment, agree to the destruction of his paraphernalia, and consent to the search of his the apartment.[8] On the other hand, Campbell was evidently sufficiently confident there would be no repercussions that he attempted to partially comply with Sergeant Austin's request that he dispose of the drug paraphernalia the officer saw when he opened the door.

[¶34] Whether or not the causal chain was sufficiently broken so that the initial unlawful search did or did not taint the evidence later found is a factual question this Court cannot answer. The district court found that the consent to search was voluntary, but due to its conclusion that there was no Fourth Amendment violation, it did not address this issue. Consequently, we will remand to the district court for a ruling on whether Campbell's consent was tainted by the initial unlawful search of his apartment. *Melendez-Garcia*, 28 F.3d at 1055-56 (remanding for the district court to determine whether the taint of an illegal arrest leading to consent to a dog search of a vehicle was purged).

## CONCLUSION

[¶35] We agree with the district court's finding that Campbell's consent to enter and search his apartment was not coerced, but voluntarily given. We find that the district court's conclusion that the initial intrusion into the apartment was lawful and justified by the emergency assistance exception to the Fourth Amendment's warrant requirement was incorrect. We remand the case to the district court to consider and determine whether the initial search tainted Campbell's consent so that the evidence thereafter discovered must be suppressed. If the district court finds that the consent was tainted, it should allow Campbell to withdraw his conditional guilty plea and suppress the evidence discovered. If it finds that it was not tainted, the plea and previous ruling should stand. Remanded for further proceedings consistent with this opinion.

---

[8] If an unlawful search of a defendant's home uncovers incriminating evidence and the police convey that discovery to the defendant, consent to a request to further search the residence may be deemed tainted by the initial illegality, and therefore suppressible because the police exploited or traded on the fruits of the initial search. 4 LaFave, *supra,* § 8.2(d); *State v. Guggenmos*, 253 P.3d 1042, 1051-52 (Or. 2011).