# IN THE SUPREME COURT, STATE OF WYOMING

## 2020 WY 37

OCTOBER TERM, A.D. 2019

March 12, 2020

MARK ALAN FERCH,

Appellant
(Defendant),

v.                                                          S-19-0163

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Natrona County*
*The Honorable Catherine E. Wilking, Judge*

*Representing Appellant:*
>   Office of the State Public Defender: Diane M. Lozano, Wyoming Public Defender; Kirk A. Morgan, Chief Appellate Counsel; H. Michael Bennett, Senior Assistant Appellate Counsel.

*Representing Appellee:*
>   Bridget L. Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General; Darrell Duane Jackson, Director, Prosecution Assistance Program; Mackenzie R. Morrison, Student Director; Toni Hartzel, Student Intern.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN, Justice.**

[¶1]    Appellant Mark Alan Ferch entered a conditional guilty plea to various drug crimes, reserving his right to appeal the district court's denial of his motion to suppress. Finding no error, we affirm.

### ISSUE

[¶2]    We restate the issue:

> Did the district court err when it concluded the warrantless search of Mr. Ferch's home was constitutional under the emergency aid exception to the Fourth Amendment's warrant requirement?

### FACTS

[¶3]    The facts are largely undisputed. At approximately 2:50 p.m. on September 9, 2018, a Casper Police Department dispatcher received a 911 hang-up call. When the dispatcher called back, Mr. Ferch answered. According to the dispatcher's notes, Mr. Ferch "said his girlfriend was drunk calling in and that he would never hit her," his "girlfriend was [the] one who dialed 911 first – then disconnected," and "everything was fine and that she is just trying to make him look bad." The dispatcher identified Mr. Ferch as a "Code 0 – carries guns on person and for universal precautions/ Code 8 as well." Two Mills Police Department officers and Sergeant Steven Leete of the Natrona County Sheriff's Office responded to Mr. Ferch's home to check on him and his girlfriend. The Mills officers arrived around 3:02 p.m., shortly before Sergeant Leete.

[¶4]    Officer Grant Pedersen's body camera captured what happened at Mr. Ferch's home when officers arrived. Officer Pedersen walked to a chain link fence at the end of the driveway and Mr. Ferch approached. Officer Pedersen asked Mr. Ferch where his girlfriend was. Mr. Ferch told him "she left in a red convertible Mustang." Officer Pedersen then asked Mr. Ferch whether his girlfriend was drunk. Mr. Ferch suggested she was drunk, stating, "Why do you think she called you guys? There's no sensible reason to call you. I'm not mean to her and I don't strike *any* women because [it] causes problems." Officer Pedersen next asked Mr. Ferch whether his girlfriend was driving. Mr. Ferch replied, "She ain't around here now. She left fifteen minutes ago." She was driving but he did not "know where she went." Officer Pedersen asked Mr. Ferch for identification but he did not have any on him.

[¶5]    Sergeant Leete arrived approximately one minute into the conversation. After Officer Pedersen recounted the information Mr. Ferch had provided to that point, Sergeant Leete asked Mr. Ferch whether his girlfriend was in the house. Mr. Ferch responded

1

"Nope." Sergeant Leete asked Mr. Ferch if he minded if officers "took a look" inside. Mr. Ferch did mind. He volunteered that his girlfriend had been "right there pulling a u-ey and leaving." He then said something inaudible on the recording to which Officer Pedersen interjected, "Her truck? You said she was in a red Ford Mustang." Mr. Ferch replied, "she was going parallel to my van here" and "there'll be tracks there."

[¶6] The officers spoke to Mr. Ferch for approximately two minutes before Sergeant Leete told Mr. Ferch they were "going to come in and check for [his girlfriend] now." When Mr. Ferch objected, Sergeant Leete informed Mr. Ferch he could either let them or they would arrest him for interference. The two Mills officers noted to each other that Mr. Ferch was "high." Sergeant Leete entered the residence for approximately one minute. He found Mr. Ferch's trailer house in a slight state of disarray, but he did not see signs of a struggle, and he did not find Mr. Ferch's girlfriend.

[¶7] When he came back out, he informed Mr. Ferch that he "saw why you don't want me to go in there," as there was "a marijuana grow in the back." That evening, officers executed a search warrant on the home and seized 10 marijuana plants, containers of suspected marijuana, baggies of suspected methamphetamine, digital scales, assorted packaging, large sums of cash, and firearms.

[¶8] The State charged Mr. Ferch with four felonies: possession of methamphetamine with intent to deliver, possession of marijuana with intent to deliver, possession of methamphetamine, and possession of marijuana (Counts 1–4). It also charged him with two misdemeanors: possession of morphine and cultivating marijuana (Counts 5–6).

[¶9] Mr. Ferch moved to suppress the evidence seized from his home. The merit of his motion turned on whether the emergency aid exception to the Fourth Amendment warrant requirement applies to the circumstances of this search. Based on the information Sergeant Leete had before arriving at Mr. Ferch's home, Mr. Ferch's statements about potential domestic violence, Mr. Ferch's behavior, and Sergeant Leete's experience, the district court concluded the State met its burden to show why the exception should apply. The court denied Mr. Ferch's motion to suppress, accordingly.

[¶10] After the court denied his motion, Mr. Ferch entered a conditional guilty plea to Counts 3, 4, 5, and 6 pursuant to W.R.Cr.P. 11(a)(2). The court imposed concurrent sentences of three to five years for each felony, suspended in favor of two years of supervised probation, and twelve days for each misdemeanor. This appeal followed.

***STANDARD OF REVIEW***

> When reviewing the district court's denial of a motion to
> suppress, this Court views "the evidence in the light most
> favorable to the district court's determination and defer[s] to

the district court's factual findings unless they are clearly erroneous." *Jennings v. State*, 2016 WY 69, ¶ 8, 375 P.3d 788, 790 (Wyo. 2016). We defer to the district court's findings because it has "the opportunity to hear the evidence, assess witness credibility, and draw the necessary inferences, deductions, and conclusions[.]" *Flood v. State*, 2007 WY 167, ¶ 10, 169 P.3d 538, 542 (Wyo. 2007) (quoting *O'Boyle v. State*, 2005 WY 83, ¶ 18, 117 P.3d 401, 407 (Wyo. 2005)). The underlying question of law—whether the search was unreasonable and therefore unconstitutional—is reviewed *de novo*. *Jennings*, ¶ 8, 375 P.3d at 790.

*Robinson v. State*, 2019 WY 125, ¶ 20, 454 P.3d 149, 156 (Wyo. 2019).

## *DISCUSSION*

[¶11] The Fourth Amendment protects "[t]he right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "As the United States Supreme Court has observed, 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Campbell v. State*, 2014 WY 156, ¶ 16, 339 P.3d 258, 262 (Wyo. 2014) (quoting *United States v. U.S. Dist. Court for East. Dist. of Mich. So. Div.*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972)). "Warrantless searches and seizures are per se unreasonable unless justified by probable cause or established exceptions." *Id.* ¶ 17, 339 P.3d at 262 (citing *Moulton v. State*, 2006 WY 152, ¶ 16, 148 P.3d 38, 43 (Wyo. 2006)).

[¶12] Because the emergency aid exception applies to homes, it is the established Fourth Amendment exception pertinent to this case.[1] The emergency aid exception dictates that "[e]vidence found after warrantless entry into a residence is admissible only if the officer who enters has a reasonable belief that there exists an emergency requiring immediate action to assist citizens or to prevent harm to persons or property in the residence." *Id.* ¶ 20, 339 P.3d at 263 (footnote omitted). As we explained in *Campbell*:

> Under the emergency-aid doctrine, a police officer can enter a
> home without a warrant if he has an objectively reasonable

---

[1] Mr. Ferch asserts the district court applied a test more akin to the community caretaker exception than the emergency aid exception. Each exception sets forth particular circumstances under which a warrantless search may be reasonable. The community caretaker exception applies "in cases which d[o] not involve entry into homes." *Campbell*, ¶ 19, 339 P.3d at 263 (collecting community caretaker cases). Even if the court inartfully articulated the exception appropriate under these circumstances, our analysis does not change. *See id.* ¶¶ 18–27, 339 P.3d at 263–65 (discussing differences between the two exceptions, concluding the district court applied an incomplete expression of the emergency aid test, and then evaluating the district court's decision under the correct articulation of the test).

basis to believe that an emergency requires that he provide immediate assistance to protect or preserve life, or to prevent serious injury and there is a reasonable nexus between the emergency and the area or places to be searched. In other words, if police officers possess an objectively reasonable basis to believe that prompt action is needed to meet an imminent danger, then . . . the Fourth Amendment . . . [does not] demand that the officers delay potential lifesaving measures while critical and precious time is expended obtaining a warrant. Indeed, the rationale of the emergency-aid exception is informed in large measure by the community-caretaking responsibilities of government officials, as explained by Judge (later Chief Justice) Burger in *Wayne v. United States* [318 F.2d 205, 212 (D.C.Cir.1963)]:

> A warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.

[*State v.*] *Vargas*, [213 N.J. 301, 324,] 63 A.3d [175,] 188 [(2013)] (internal citations and quotation marks omitted); *see also United States v. Bute*, 43 F.3d 531, 539 (10th Cir. 1994). Courts generally limit the emergency assistance exception to cases in which the officer acts to preserve life or prevent serious injury believing that there is a genuine emergency. Therefore, to justify use of the exception, the government must show that the officer had a reasonable and articulable belief that immediate aid or assistance was required to prevent serious harm to persons or property. *Id.*; *see also State v. Ryon*, 137 N.M. 174, [184–86,] 108 P.3d 1032, 1042–44 (2005).

*Id.* We consider the totality of the circumstances when applying this exception. *Moulton*, ¶¶ 16, 32, 148 P.3d at 43, 46.

[¶13] Two cases, in particular, help us determine whether the emergency aid exception permits the warrantless search of Mr. Ferch's home. We look first to *Campbell*, the facts of which did not support application of the exception. *Campbell*, ¶ 35, 339 P.3d at 266–67. In that case, two law enforcement officers went to the last known address of a young man who had not spoken to his mother in several weeks. *Id.* ¶ 3, 339 P.3d at 260. When

they arrived at his apartment, the curtains were closed but the lights were on, they saw footprints in the snow at the entrance and heard the television and a dog barking. *Id.* No one responded when an officer knocked and rang the doorbell. *Id.* An officer opened the unlocked door several feet and called out for the young man and, in the process, observed a glass bong. *Id.* ¶ 4, 339 P.3d at 260–61. We concluded the district court incorrectly determined the initial intrusion into the apartment was justified by the emergency aid exception, *id.* ¶ 35, 339 P.3d at 266–67, explaining that as distressing as the lack of communication might have been for the young man's mother, it fell "far short of an emergency or a basis to believe [the young man] required immediate aid." *Id.* ¶ 26, 339 P.3d at 264–65. The remaining facts further refuted the likelihood of an immediate emergency because, as we noted, it is not uncommon to leave a television "on as a deterrent to would-be intruders" or to leave a dog in a home before leaving briefly. *Id.* ¶ 26, 339 P.3d at 265. Consequently, no articulable facts supported a claim that the officer who entered the home reasonably and objectively believed he was dealing with a genuine emergency that required immediate entry into the apartment. *Id.* ¶¶ 26–27, 339 P.3d at 264–65.

[¶14] In *Moulton*, though we did not articulate the specific requirement that an officer must reasonably believe he faces a genuine emergency to which he must respond, we agreed with the district court that the circumstances in that case supported application of the emergency aid exception. *Moulton*, ¶¶ 1, 32, 148 P.3d at 39–40, 46; *Campbell*, ¶ 25, 339 P.3d at 264 (citing *Moulton*, ¶¶ 20–21, 148 P.3d at 44). Ms. Moulton, an emergency medical technician, contacted a dispatcher at 4:30 a.m. on a portable radio. *Moulton*, ¶¶ 3, 23, 148 P.3d at 40, 44. She identified herself using her medic's call sign, and her voice conveyed a sense of urgency. *Id.* ¶¶ 3, 22–23, 148 P.3d at 40, 44. The rest of the transmission was garbled. *Id.* ¶¶ 3, 21, 148 P.3d at 40, 44. The dispatcher tried to call Ms. Moulton but received no answer. *Id.* ¶ 3, 148 P.3d at 40. Officers went to the Moulton family's home, concerned Ms. Moulton had encountered an emergency. *Id.* ¶ 4, 148 P.3d at 40. No one answered when they knocked on the door, but the door was unlocked, so they entered and searched the home. *Id.* ¶¶ 4–5, 148 P.3d at 40. One of Ms. Moulton's daughters indicated her parents might be at the "lake." *Id.* ¶ 5, 148 P.3d at 40. When officers looked into the master bedroom, they observed "some type of system for growing mushrooms." *Id.* ¶¶ 6, 10, 148 P.3d at 40, 41. In applying the emergency aid exception, we concluded "the sheriff's office had no real choice but to respond" to the urgent, but garbled, radio transmission. *Id.* ¶ 23, 148 P.3d at 44. "Ignoring the call was not a reasonable option." *Id.*

[¶15] The circumstances preceding the search of Mr. Ferch's home, as reflected in the district court's unchallenged findings,[2] more closely align with the circumstances in *Moulton*, and by the thinnest of margins justify application of the emergency aid exception in this case.

---

[2] Mr. Ferch does not contend any of the district court's factual findings are clearly erroneous.

[¶16]  At the suppression hearing, the State introduced the 911 dispatcher's notes and Officer Pedersen's body camera video.  Sergeant Leete, who had over 27 years' experience, including 25 years on patrol, numerous responses to 911 hang ups, and training and experience with domestic violence situations, testified that Sheriff's Office policy required he "attempt to contact whoever called 911 to ascertain if there is an actual emergency."  Before arriving at Mr. Ferch's home, he reviewed the dispatcher's notes.  A "Code 0" meant "an officer should be aware that this person could be dangerous" and "could be armed."  A "Code 8" meant the person had exhibited signs of mental illness previously.

[¶17]  Sergeant Leete testified that Mr. Ferch's unsolicited statements that he did not strike women seemed suspicious.  With respect to Mr. Ferch's suggestion that his girlfriend "tore out of here," Sergeant Leete testified that the road was "dirt and probably really sandy based," he had been to the area before, and he opined that if a vehicle recently left in the manner Mr. Ferch described, it would have left marks on the road.  There was "[n]othing consistent with a vehicle tearing out of the area."  In addition, Mr. Ferch appeared to be under the influence of a stimulant, as "[h]is speech was somewhat forceful," "he was overtalkative," and his hand and arm movements were exaggerated.  Based on his training and experience, Sergeant Leete believed there was "a high possibility that [Mr. Ferch's girlfriend] might be in the residence and need assistance."  He was concerned she "could have been assaulted or harmed in some way or worse."

[¶18]  Mr. Ferch attempts to distinguish *Moulton* on grounds that the circumstances in this case involve a 911 hang-up rather than a completed 911 call.  According to Mr. Ferch, a 911 hang-up does not indicate an actual emergency.  The hang up could "be a prank or [an] accidental dialing."

[¶19]  We cannot so easily dismiss the implications of a 911 hang-up.  "911 calls are the predominant means of communicating emergency situations."  *United States v. Martinez*, 643 F.3d 1292, 1297 (10th Cir. 2011) (quoting *United States v. Najar*, 451 F.3d 710, 719 (10th Cir. 2006)); *see also United States v. Richardson*, 208 F.3d 626, 629–30 (7th Cir. 2000).  "At the very least, '911 hang-ups inform the police that someone physically dialed 9–1–1 . . . and either hung up or was disconnected before he or she could speak to the operator."  *Martinez*, 643 F.3d at 1296–97.  "In the case of a 911 hang-up call, there is a heavy governmental interest in assuring that the danger or distress which prompted the call has been discovered and resolved by responding officers."  *State v. Pearson-Anderson*, 136 Idaho 847, 851, 41 P.3d 275, 279 (App. 2001).

[¶20]  We conclude that ignoring the 911 hang-up under the circumstances presented here, as in *Moulton*, was not a reasonable option.  *See Moulton*, ¶ 23, 148 P.3d at 44.  When the dispatcher immediately called back and spoke to Mr. Ferch, Mr. Ferch did more than just offer an explanation that his girlfriend was trying to make him look bad.  He volunteered that he did not hit women, and in doing so suggested the possibility that his girlfriend called 911 to report a domestic violence situation.  That he answered the phone instead of his

girlfriend left open the question of whether the individual who had actually called 911 still needed assistance. Neither the dispatcher nor responding officers could reasonably deem Mr. Ferch's explanation credible without further assessing the situation.

[¶21] The conversation with Mr. Ferch outside his home did not alleviate the responding officers' concerns. Mr. Ferch again volunteered that he was not mean to his girlfriend and did not hit women. As noted above, under the circumstances this suggested the possibility of domestic violence. Mr. Ferch's inconsistent and unsupported statements about his girlfriend's departure also cast doubt on whether she had actually left the residence. That Mr. Ferch appeared to be under the influence of a stimulant further undermined his credibility and contributed to the sense that there was a genuine emergency.

[¶22] Mr. Ferch is correct that prior to entering his home officers could have taken less intrusive action to determine whether his girlfriend was safe, such as attempting to call or locate her. But the law did not require them to do so in this case. Considering the totality of these circumstances, and viewing the evidence in the light most favorable to the district court's decision that Sergeant Leete "had a reasonable and articulable belief that prompt action was needed by him to meet imminent danger or to prevent serious harm to persons," *see Robinson*, ¶ 20, 454 P.3d at 156, we agree intrusion into Mr. Ferch's home was lawful and justified by the emergency aid exception to the Fourth Amendment's warrant requirement. The district court did not err when it denied Mr. Ferch's motion to suppress.

[¶23] Affirmed.

7