2010 WY 47

**Levi William JOHNSON, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. S–09–0029.**

Supreme Court of Wyoming.

April 20, 2010.

Representing Appellant: Kenneth DeCock of Plains Law Offices LLP, Gillette, Wyoming.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Leda J. Pojman, Senior Assistant Attorney General.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, BURKE, JJ.

GOLDEN, Justice.

[¶ 1] Appellant Levi William Johnson entered a conditional plea of guilty to one count of conspiracy to deliver a controlled substance. On appeal, Jones maintains the district court erred in denying his motion to suppress the drug evidence. Finding no error, we affirm the district court's suppression ruling.

## ISSUE

[¶ 2] The dispositive issue in this case is whether the drug evidence was obtained in violation of Johnson's constitutional rights under the Fourth Amendment to the United States Constitution and Article 1, § 4 of the Wyoming Constitution.

## FACTS

[¶ 3] Johnson was charged with possession of marijuana with intent to deliver and conspiracy to deliver marijuana, as proscribed by Wyo. Stat. Ann. § 35–7–1031(a)(ii) and § 35–7–1042 (LexisNexis 2009). He filed a motion to suppress the marijuana evidence, contending it was the product of an unlawful search under both the Fourth Amendment to the United States Constitution and Article 1, § 4 of the Wyoming Constitution. Johnson insisted his consent for the officers' initial entry into the home was coerced and involuntary because one officer indicated that, if Johnson refused consent, a search warrant would be obtained resulting in a more intrusive search of his residence. Johnson contended that any evidence obtained as a result of that initial unlawful entry, including the evidence recovered during execution of a later search warrant, was tainted and, thus, should be suppressed as fruit of the poisonous tree. Following an evidentiary hearing, the district court summarily denied Johnson's suppression motion, concluding Johnson had "voluntarily consented to the search of his residence." Johnson subsequently entered a conditional guilty plea to the conspiracy charge, reserving the right to appeal the district court's suppression ruling, and the State dismissed the remaining charge.

[¶ 4] This is the second time this case has been before us on appeal. In the first appeal, we determined the district court's suppression ruling, which was devoid of factual findings and legal reasoning, was insufficient to permit adequate review of Johnson's constitutional claims. *Johnson v. State*, 2009 WY 104, 214 P.3d 983 (Wyo.2009). We therefore remanded the case to the district court "for the limited purpose of the entry of a supplemental order including the factual findings required by [W.R.Cr.P.] 12(f) as well as a statement by the district court of the conclusions of law it has reached on those findings." *Id.*, ¶ 27, 214 P.3d at 989.

[¶ 5] As directed, the district court entered a supplemental order, which contained the following findings of fact:

1. On February 22, 2008, Officer Timothy Vogt of the Gillette Police Department responded to [Johnson's residence] in response to a report of a vehicle on fire.

2. Officer Vogt found the car on fire approximately four to five feet away from the mobile home located at the above address.

3. Officer Vogt investigated to determine the identity of the vehicle's owner by contacting Police Department dispatch. He learned that the owner was Levi Johnson. Mr. Johnson was not present at the scene.

4. Officer Vogt testified that Brittany Kuhnel, Levi Johnson's girlfriend and resident of the mobile home, arrived at the

scene while Officer Vogt and fire department personnel were still investigating the fire.

5. Ms. Kuhnel admitted to Officer Vogt that she had contraband inside the mobile home. Officer Vogt then contacted dispatch and asked that a narcotics officer be sent to the scene.

6. Detective Chad Trebby of the Gillette Police Department was the narcotics investigator dispatched to the scene in response to Officer Vogt's request.

7. Detective Trebby testified that he talked with Ms. Kuhnel, who indicated that there may have been a small amount of marijuana inside the residence. Detective Trebby requested her permission to go inside with her and retrieve the small amount of marijuana she had described. She agreed, but wanted to speak with her boyfriend, Mr. Johnson, first.

8. Mr. Johnson had arrived at the scene sometime before Detective Trebby. Ms. Kuhnel, Detective Trebby and Officer Vogt approached Mr. Johnson; Ms. Kuhnel informed Mr. Johnson that the officers wanted to search the residence because she had admitted there was a small amount of marijuana inside.

9. Detective Trebby asked Mr. Johnson for permission to enter the residence to retrieve the small amount of marijuana that Ms. Kuhnel had told the officers about. Mr. Johnson then asked what would happen if he did not give permission.

10. Ms. Kuhnel told Mr. Johnson the officers would go get a search warrant and come back and search anyway.

11. Detective Trebby clarified by informing Ms. Kuhnel and Mr. Johnson that the officers would apply for a search warrant, and if it were granted then they would return and search.

12. Detective Trebby again asked Mr. Johnson for permission to enter the residence and retrieve the small amount of marijuana that had been described by Ms. Kuhnel. The detective did not recall specifically the words used by Mr. Johnson, but he testified "he did make a statement that said—he indicated to me that he would allow us to go inside with him and get [the marijuana], then he began walking towards the front door with us following." Mr. Johnson and Ms. Kuhnel then led the officers to the front door of the trailer and entered a code in order to unlock the door.

13. Mr. Johnson entered the residence ahead of the officers, retrieved a small bag of marijuana and three or four glass pipes and gave them to the officers, stating that was all he had inside the residence.

14. Detective Trebby again asked Mr. Johnson's consent to search the residence. Mr. Johnson asked questions as to why the officers wanted to continue searching. Detective Trebby told Mr. Johnson that he would need a direct "yes" or "no" regarding permission to conduct the search.

15. Based upon Mr. Johnson's apparent hesitance to consent, Detective Trebby told him he would not accept consent at that point and that Officer Vogt would remain at the house while Detective Trebby went to apply for a search warrant and that he would return in approximately an hour.

16. Detective Trebby did not tell Mr. Johnson or Ms. Kuhnel that he was certain that he would be granted a search warrant.

17. When Detective Trebby informed Mr. Johnson and Ms. Kuhnel that he would be leaving to go apply for a search warrant, they said that would not be necessary and granted consent to search the home.

18. The detective hand-drafted a written consent to search for drugs and paraphernalia on a blank sheet of paper, and both Mr. Johnson and Ms. Kuhnel signed that document.

19. Once the written consent had been signed, Detective Trebby asked further permission to utilize a canine in order to assist with the search of the residence. Mr. Johnson and Ms. Kuhnel did not give consent to use of a canine, giving several reasons. Detective Trebby told them if they did not consent, a canine would not be used.

20. Mr. Johnson and Ms. Kuhnel expressed concern that the officers would be "tearing up their house and throwing things around" in conducting the search. The detective told them it was "not like

you see in the movies", further informing them that the officers would conduct a thorough and systematic search by hand, but since they would not be using a canine, that they would have to go through all the drawers and other items inside the residence.

21. Before the officers began the search, Mr. Johnson told Detective Trebby there was some paraphernalia in the back bedroom. He led Detective Trebby to a cabinet where there were several bongs and glass pipes.

22. Detective Trebby began to hand-search the master bedroom while Officer Vogt stayed with the other occupants of the residence in the living room.

23. After a short time, Detective Trebby heard a voice, eventually identified as Mr. Johnson's mother, coming from the living room asking why the officers were there, why they were searching, and who gave them permission to search. Mr. Johnson then requested that Detective Trebby discontinue the search, which he did.

24. Officer Vogt remained at the residence while Detective Trebby went to the County Attorney's office to apply for a search warrant, which was granted.

25. Mr. Johnson's long-time friend Richard Pfeil was present in the residence on February 22, 2008. He arrived at the scene with Mr. Johnson and testified that he then went inside to sit down because he had a broken ankle.

26. Mr. Pfeil testified that he was sitting in the living room of the trailer when he heard a conversation between Detective Trebby and Mr. Johnson as they were outside and walking toward the front door.

27. Mr. Pfeil testified that after Mr. Johnson asked what would happen if he did not grant permission for the officers to enter the residence, Detective Trebby told Mr. Johnson he would go get a search warrant and his team and tear the place apart.

28. Mr. Pfeil testified that the door and windows to the residence were closed when he heard the conversation.

29. On rebuttal, Detective Trebby testified in response to Mr. Pfeil's statements. He stated he had told Mr. Johnson that the proposed search would **not** be "like you see on TV. It wasn't like we were going in and tear his house up."

30. Detective Trebby testified that he had explained to Mr. Johnson, "[D]ue to the amount of time it took to obtain a search warrant and manpower that we needed to secure the scene, it would likely occur that . . . Officer Vogt would be released from the scene and I would request the assistance of my counterparts with the police department and possibly an agent with the DCI to assist and secure and search the residence[.]" The detective testified that he believed this dialogue was what Mr. Pfeil was referring to when he testified that the detective said he would get "his team" to conduct the search.

31. The court finds credible Detective Trebby's testimony as to this exchange and finds it unlikely that the conversation occurred as testified to by Mr. Pfeil. Mr. Pfeil "witnessed" the conversation through the exterior wall of the residence. He is a longtime friend of Mr. Johnson. The court simply does not believe his testimony was an accurate portrayal of the conversation that occurred.

32. The court finds the testimony of Officer Vogt and Detective Trebby credible. The court finds the events of February 22, 2008 at the Johnson/Kuhnel residence unfolded as they described them.

33. The court finds that Mr. Johnson understood the implications of allowing the officers to enter his residence, particularly given his questions as to what would happen if he did not give his permission.

34. The court finds that Mr. Johnson understood that he could refuse the request of the officers to enter the residence.

35. The court finds credible Detective Trebby's testimony regarding the information he provided Mr. Johnson relative to obtaining a search warrant and the search that would follow if a search warrant were granted.

36. The court finds credible the testimony of both officers that the length of their conversations with Mr. Johnson and Ms.

Kuhnel were brief. For example, the conversation about entering the residence and the potential of a warranted search occurred in the time it took to walk approximately 20 feet. Detective Trebby estimated this time as 30 to 45 seconds.

Based on these findings, the district court maintained its denial of the motion.

### DISCUSSION

#### *Standard of Review*

[¶ 6] The standard we employ on review of a trial court's suppression ruling is well established:

> In reviewing a trial court's ruling on a motion to suppress evidence, we do not interfere with the trial court's findings of fact unless the findings are clearly erroneous. We view the evidence in the light most favorable to the trial court's determination because the trial court has an opportunity at the evidentiary hearing to assess the credibility of the witnesses, weigh the evidence, and make the necessary inferences, deductions, and conclusions. The constitutionality of a particular search is a question of law that we review *de novo*. *Shaw v. State*, 2009 WY 18, ¶ 19, 201 P.3d 1108[, 1112] (Wyo.2009).

*Latta v. State*, 2009 WY 35, ¶ 10, 202 P.3d 1069, 1071 (Wyo.2009); *see also Seymour v. State*, 2008 WY 61, ¶ 17, 185 P.3d 671, 676 (Wyo.2008); *Garvin v. State*, 2007 WY 190, ¶ 10, 172 P.3d 725, 728 (Wyo.2007).

#### *Analysis*

[¶ 7] The Fourth Amendment to the United States Constitution and Article 1, § 4 of the Wyoming Constitution guarantee all citizens the right to be free from unreasonable searches and seizures. *Morris v. State*, 908 P.2d 931, 934–35 (Wyo.1995). It is axiomatic that "a home is entitled to special dignity and special sanctity and that the proper way to search a home is to obtain a search warrant." *Brown v. State*, 738 P.2d 1092, 1094 (Wyo.1987). Thus, searches and seizures inside a home without a warrant are presumptively unreasonable. *Morris*, 908 P.2d at 935. There are, however, a few "well-delineated exceptions to the warrant requirement." *Vassar v. State*, 2004 WY 125, ¶ 19,

99 P.3d 987, 995 (Wyo.2004). Among the recognized exceptions are searches and/or seizures conducted pursuant to valid consent. *Pena v. State*, 2004 WY 115, ¶ 29, 98 P.3d 857, 870 (Wyo.2004); *Meadows v. State*, 2003 WY 37, ¶ 23, 65 P.3d 33, 40 (Wyo.2003).

[¶ 8] In addressing the issue of consent, we have recognized that

> a waiver of constitutional rights under our constitution must appear by clear and positive testimony, and, if a search or seizure is based upon the proposition that consent was given, there should be no question from the evidence that consent was "really voluntary and with a desire to invite search [or further questioning], and not done merely to avoid resistance." Acquiescence and nonresistance have not been deemed sufficient under Wyoming law to establish consent.

*Seymour*, ¶ 19, 185 P.3d at 677 (quoting *O'Boyle v. State*, 2005 WY 83, ¶ 38, 117 P.3d 401, 412 (Wyo.2005)). Under both the Wyoming and United States Constitutions, we examine the totality of the circumstances to determine whether consent was voluntary. *Id.*

[¶ 9] We have reviewed the evidence in this case and are convinced the district court's findings of fact are not clearly erroneous. We also agree with the district court's conclusion that, given the totality of the circumstances, the law enforcement officers did not create a coercive atmosphere. We cannot state it better than the district court:

> [T]he officers' demeanor was appropriate, non-threatening and not coercive. No weapons were brandished. Mr. Johnson was not handcuffed or otherwise restrained. He was not placed under arrest. The better evidence supports the finding that the tone of the dialogue among the players was conversational. The length of the discussion between the officers and Mr. Johnson was brief. The nature of the conversation before consent was given by Mr. Johnson was not coercive, but rather informational. The court finds credible Detective Trebby's description of that exchange: based on what Ms. Kuhnel had admitted, the detective could apply for a

search warrant and, if it was granted, return with "his team" and execute the warrant.

Whether analyzed under the Wyoming Constitution or the United States Constitution, Johnson's argument that his consent was coerced, and thus involuntary, fails. Affirmed.