# IN THE SUPREME COURT, STATE OF WYOMING

# 2022 WY 77

APRIL TERM, A.D. 2022

June 16, 2022

NANCY MAY HAWKEN,

Appellant
(Defendant),

v.

S-21-0194, S-21-0195

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Crook County*
*The Honorable John R. Perry, Judge*

*Representing Appellant:*
>    *Ronald E. Wirthwein, The Nick Carter Law Firm, Gillette, Wyoming. Argument by Mr. Wirthwein.*

*Representing Appellee:*
>    *Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General; Donovan Burton, Assistant Attorney General. Argument by Mr. Burton.*

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FOX, Chief Justice.**

[¶1]    Nancy Hawken entered a conditional plea of guilty to felony driving under the influence. On appeal, she claims the district court erred in denying her motion to suppress evidence obtained after law enforcement entered her home without a warrant or consent. We reverse and remand.

## *ISSUES*

[¶2]    We restate the issues on appeal as follows:

> 1. Did the district court err when it denied Ms. Hawken's motion to suppress the evidence against her based on its conclusion that her husband consented to entry of her home?
>
> 2. Does the unlawful entry of the Hawken home require suppression of the evidence obtained as a result of that entry?

## *FACTS*

[¶3]    On December 15, 2020, Wyoming Highway Patrol Trooper Josh Undeberg received a report that a vehicle had crashed in a ditch near Sundance, Wyoming, and that the driver appeared intoxicated. When he arrived at the scene, he opened and checked the vehicle and found no one in it, but he detected a strong odor of alcohol. He ran the vehicle's plates and discovered it belonged to Nancy Hawken, who lived about three miles away.

[¶4]    Trooper Undeberg drove to Ms. Hawken's home, and as he approached, he observed tire tracks in the fresh snow where it appeared a vehicle had turned out of the driveway and onto the highway. From this he deduced that Ms. Hawken had received a ride home. He then parked and encountered a man standing outside the home, who identified himself as Tyler Hawken, Ms. Hawken's husband.

[¶5]    Trooper Undeberg asked to speak with Ms. Hawken, and Mr. Hawken replied that she was not home. Trooper Undeberg said he knew she was home because he had talked to the person who dropped her off, though that was untrue. Mr. Hawken asked what was going on, and Trooper Undeberg told him about the car. Mr. Hawken said he knew about the accident and had been about to go look at it. Trooper Undeberg repeated that he wanted to talk to Ms. Hawken, and Mr. Hawken said he would go get her.

[¶6]    Mr. Hawken walked toward the house and entered the home's mudroom. Mr. Hawken did not invite the trooper to follow him into the mudroom, and the record contains no indication Trooper Undeberg requested permission to follow him. Nonetheless, Trooper

Undeberg followed, and as he stepped into the house, Mr. Hawken said, "Wait right here." Trooper Undeberg testified:

> There were a couple statements made as we were going into the house; he was in the house, I was coming into the house, and he said, "Wait right here," and then there was – so I – I stopped inside of the mudroom and there was one point when he was going through the other door, he said, "I'll be right back."

[¶7]   Trooper Undeberg waited in the mudroom as requested. He heard Mr. Hawken talking with a woman he assumed was Ms. Hawken, and heard him say, "The sheriffs are here. You need to go out and talk to them." When the conversation between the Hawkens became heated, Trooper Undeberg called Mr. Hawken back to the mudroom to avoid a possible altercation. Mr. Hawken returned, and Ms. Hawken followed him.

[¶8]   Trooper Undeberg told Ms. Hawken to come outside with him to his car so they could talk about what happened with her vehicle. Ms. Hawken complied, and, because she had trouble maintaining her balance, Trooper Undeberg helped her walk to his car. After questioning her, Trooper Undeberg arrested her for driving under the influence. Ms. Hawken's breathalyzer test at the detention center indicated a blood alcohol concentration of .260%.

[¶9]   The State charged Ms. Hawken with driving under the influence, driving with a suspended license, driving without an interlock device, and failure to maintain a single lane. It also moved to revoke her probation.

[¶10]  Ms. Hawken filed a motion to suppress, claiming that Trooper Undeberg unlawfully entered her home, and that any statements or evidence gained as a result of that unlawful entry should be suppressed. The district court found that Mr. Hawken voluntarily consented to Trooper Undeberg's entry into the home and denied her motion.

[¶11]  Ms. Hawken entered a conditional guilty plea to one count of felony driving under the influence and agreed to admit the allegations against her in the probation revocation proceeding. The court revoked her probation and reinstated the sentence of thirty to sixty months for that offense. It sentenced her to a term of five to seven years imprisonment for the felony driving under the influence count, to be served concurrently with the reinstated sentence on her probation revocation. Ms. Hawken timely appealed.

### *STANDARD OF REVIEW*

[¶12]  Ms. Hawken challenges the district court's denial of her motion to suppress under the Fourth Amendment to the United States Constitution.

In reviewing a denial of a motion to suppress evidence, we adopt the district court's factual findings unless those findings are clearly erroneous. *Rodriguez v. State*, 2018 WY 134, ¶ 15, 430 P.3d 766, 770 (Wyo. 2018) (citing *Jennings v. State*, 2016 WY 69, ¶ 8, 375 P.3d 788, 790 (Wyo. 2016)). We view the evidence in the light most favorable to the district court's decision because the court conducted the hearing and had the opportunity to "assess the witnesses' credibility, weigh the evidence and make the necessary inferences, deductions and conclusions." *Kunselman v. State*, 2008 WY 85, ¶ 9, 188 P.3d 567, 569 (Wyo. 2008) (quoting *Hembree v. State*, 2006 WY 127 ¶ 7, 143 P.3d 905, 907 (Wyo. 2006)). "On those issues where the district court has not made specific findings of fact, this Court will uphold the general ruling of the court below if supported by any reasonable view of the evidence." *Feeney v. State*, 2009 WY 67, ¶ 9, 208 P.3d 50, 53 (Wyo. 2009) (citing *Neilson v. State*, 599 P.2d 1326, 1330 (Wyo. 1979)).

*Pryce v. State*, 2020 WY 151, ¶ 16, 477 P.3d 90, 94-95 (Wyo. 2020) (quoting *Brown v. State*, 2019 WY 42, ¶ 10, 439 P.3d 726, 730 (Wyo. 2019)). However, the underlying question of whether the search and seizure was constitutional is a question of law, which we review de novo. *Fuller v. State*, 2021 WY 36, ¶ 8, 481 P.3d 1131, 1133 (Wyo. 2021) (quoting *Robinson v. State*, 2019 WY 125, ¶ 20, 454 P.3d 149, 156 (Wyo. 2019)).

## *DISCUSSION*

### *I. Trooper Undeberg did not have consent to enter the Hawken house.*

[¶13] Ms. Hawken contends the district court erred in denying her motion to suppress because the record does not support a finding that Mr. Hawken consented to Trooper Undeberg's entry into the Hawken home. The parties agree that Mr. Hawken did not expressly consent to Trooper Undeberg's entry. The question, in this case of first impression for this Court, is whether the district court could conclude that he gave implied consent to Trooper Undeberg's entry.[1]

[¶14] The United States Supreme Court recently reaffirmed the role of the Fourth Amendment in preserving the sanctity of the home.

---

[1] Ms. Hawken argues that the evidence should have been suppressed under both the Fourth Amendment of the United States Constitution and Article 1, Section 4 of the Wyoming Constitution, but her plea agreement reserved only the right to appeal the district court's Fourth Amendment ruling. We do not consider issues not reserved in a conditional guilty plea, *Ward v. State*, 2015 WY 10, ¶ 18, 341 P.3d 408, 412 (Wyo. 2015), and we therefore address this issue under only a Fourth Amendment framework.

The place to start is with our often-stated view of the constitutional interest at stake: the sanctity of a person's living space. "When it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013). At the Amendment's "very core," we have said, "stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion." *Collins v. Virginia*, 584 U. S. ——, —— ——, 138 S.Ct. 1663, 1670, 201 L.Ed.2d 9 (2018) (internal quotation marks omitted). Or again: "Freedom" in one's own "dwelling is the archetype of the privacy protection secured by the Fourth Amendment"; conversely, "physical entry of the home is the chief evil against which it is directed." *Payton v. New York*, 445 U.S. 573, 585, 587, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (internal quotation marks omitted). The Amendment thus "draws a firm line at the entrance to the house." *Id.*, at 590, 100 S.Ct. 1371.

*Lange v. California*, 594 U.S. ___, ___, 141 S.Ct. 2011, 2018, 210 L.Ed.2d 486 (2021).

[¶15]  This Court has also recognized the important role of the Fourth Amendment in relation to the home. "The Fourth Amendment protects 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Fuller*, 2021 WY 36, ¶ 9, 481 P.3d at 1133 (quoting U.S. Const. amend. IV). "Physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Id*. (quoting *United States v. United States Dist. Court for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972)). Entry into a home, no matter how limited, constitutes a search. *United States v. Jones*, 701 F.3d 1300, 1317 (10th Cir. 2012) (citing *Payton v. New York*, 445 U.S. 573, 582 n.17, 100 S.Ct. 1371, 1377 n.17, 63 L.Ed.2d 639 (1980)).

[¶16]  "Warrantless searches and seizures are per se unreasonable unless they are justified by probable cause and established exceptions." *Fuller*, 2021 WY 36, ¶ 9, 481 P.3d at 1134 (quoting *Pena v. State*, 2004 WY 115, ¶ 29, 98 P.3d 857, 870 (Wyo. 2004)); *see also Mickelson v. State*, 906 P.2d 1020, 1024 (Wyo. 1995) ("When the threshold of a home . . . intervenes, probable cause is insufficient to warrant entry absent the presence of [an established exception] or the audience of a neutral and detached magistrate."). A search conducted pursuant to valid consent is a recognized exception to the warrant requirement. *Johnson v. State*, 2010 WY 47, ¶ 7, 228 P.3d 1306, 1310 (Wyo. 2010) (citing *Pena*, 2004 WY 115, ¶ 29, 98 P.3d at 870); *see also United States v. Guillen*, 995 F.3d 1095, 1103 (10th Cir. 2021) ("Voluntary consent is a longstanding exception to the general requirement that law enforcement officers must have a warrant to enter a person's home.")

4

(quoting *United States v. Warwick*, 928 F.3d 939, 943 (10th Cir. 2019)). It requires the government to prove: "(1) the officers received either express or implied consent and (2) that consent was freely and voluntarily given." *Guillen*, 995 F.3d at 1103 (citing *Jones*, 701 F.3d at 1317); *see also United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007)).

[¶17]   Ms. Hawken does not claim Trooper Undeberg coerced Mr. Hawken into consenting to his entry into the Hawken home, so the second prong of the required consent showing is not at issue. The question is instead whether Mr. Hawken gave implied consent with his nonverbal gestures or actions. Implied consent may be found where a reasonable officer would believe a person consented to entry based on the totality of the circumstances. *United States v. Castellanos*, 518 F.3d 965, 969-70 (8th Cir. 2008) (quoting *United States v. Jones*, 254 F.3d 692, 695 (8th Cir. 2001)); *see also O'Boyle v. State*, 2005 WY 83, ¶ 60, 117 P.3d 401, 418 (Wyo. 2005) (quoting *Grant v. State*, 2004 WY 45, ¶ 22, 88 P.3d 1016, 1021 (Wyo. 2004)). The Tenth Circuit has explained:

> Implied consent to enter a home is no less valid than explicit consent. Consent "must be clear but it need not be verbal. Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer."

*United States v. Lopez-Carillo*, 536 F.App'x 762, 768 (10th Cir. 2013) (quoting *Guerrero*, 472 F.3d at 789-90) (internal citation omitted).

[¶18]   The State bears the burden of proving consent by a preponderance of the evidence. *O'Boyle*, 2005 WY 83, ¶ 60, 117 P.3d at 417 (quoting *Meadows v. State*, 2003 WY 37, ¶ 23, 65 P.3d 33, 40 (Wyo. 2003)). Applying both the Fourth Amendment and our constitution, we have said:

> [A] waiver of constitutional rights under our constitution must appear by clear and positive testimony, and, if a search or seizure is based upon the proposition that consent was given, there should be no question from the evidence that consent was "really voluntary and with a desire to invite search or further questioning, and not done merely to avoid resistance." Acquiescence and nonresistance have not been deemed sufficient . . . to establish consent.

*Johnson*, 2010 WY 47, ¶ 8, 228 P.3d at 1310 (quoting *Seymour v. State*, 2008 WY 61, ¶ 19, 185 P.3d 671, 677 (Wyo. 2008)); *see also United States v. Shrum*, 908 F.3d 1219, 1238 (10th Cir. 2018) ("The Government cannot meet its burden 'by showing no more than acquiescence to a claim of lawful authority.'") (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548-49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968)); *State v. Daino*, 475 P.3d 354,

360 (Kan. 2020) ("[T]o demonstrate valid consent, the State must . . . provide clear and positive testimony that consent was unequivocal, specific, and freely and intelligently given[.]") (citing *State v. Cleverly*, 385 P.3d 512, 522 (Kan. 2016)); *State v. Reed*, 920 N.W.2d 56, 59 (Wis. 2018) ("Consent to search must be unequivocal and specific[.]") (citing *Andrews v. Hickman Cnty.*, 700 F.3d 845, 854 (6th Cir. 2012)); *United States v. Amador-Beltran*, 655 F.App'x 666, 668 (10th Cir. 2016) (valid consent requires "clear and positive testimony that consent was unequivocal and specific and freely given") (quoting *Guerrero*, 472 F.3d at 789).

[¶19]   Federal courts have considered various factors in the totality of circumstances to determine whether there was implied consent. If an officer requests permission to enter a home, a court is more likely to find consent when factored with a defendant's nonverbal conduct, such as a failure to object. *See Jones*, 701 F.3d at 1321 (implied consent found where officer indicated desire to search home and defendant walked toward home and unlocked back door with officers behind him); *United States v. Shaibu*, 920 F.2d 1423, 1427 (9th Cir. 1990) (no implied consent in defendant's opening of door and failure to object to entry where officers did not indicate desire to enter home); *United States v. Little*, 431 F.App'x 417, 420 (6th Cir. 2011) (where officer did not request permission to enter, no implied consent could be found even though defendant knew officer and did not object to entry); *Bashir v. Rockdale Cnty.*, 445 F.3d 1323, 1329 (11th Cir. 2006) (no implied consent where Bashir did not object to entry and asked questions after entry but officers did not request permission to enter).[2] As these cases illustrate, the failure to object to, or mere acquiescence in, an officer's entry into the home is not in itself clear evidence of implied consent. *Bashir*, 445 F.3d at 1329; *Shaibu*, 920 F.2d at 1427; *Little*, 431 F.App'x at 420; *see also Johnson*, 2010 WY 47, ¶ 8, 228 P.3d at 1310.[3]

---

[2] *Bashir* was a civil suit brought pursuant to 42 U.S.C. § 1983. In addressing the lawfulness of the officers' conduct, however, the court did not confine its analysis to the question of whether the officers had a reasonable but mistaken belief that they could lawfully enter the plaintiff's home. *Compare Layland v. Stevens*, 2007 WY 188, ¶¶ 29-30, 171 P.3d 1070, 1076-77 (Wyo. 2007). It instead did the same Fourth Amendment analysis it would have done had it been presented with a suppression question.

[3] The State argues that the Tenth Circuit said otherwise in *United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir. 1999). We disagree. In *Patten*, the question was not whether the defendant consented to a search but the scope of that consent, and whether the defendant could allow the scope to be broadened by remaining silent. In that context, the court said:

> In determining the scope of a defendant's consent, we ask what a reasonable person would have understood by the exchange between the defendant and police officer. A defendant's silence and acquiescence may support a finding of voluntary consent. Moreover, a defendant's "failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent."

*Id*. at 1194; *see also Johnson*, 2010 WY 47, ¶ 8, 228 P.3d at 1310 (acquiescence not sufficient to establish consent); *Shrum*, 908 F.3d at 1238 ("The Government cannot meet its burden 'by showing no more than acquiescence to a claim of lawful authority.'") (quoting *Bumper*, 391 U.S. at 548-49, 88 S.Ct. 1788).

6

[¶20]   Another factor courts consider in determining if a party impliedly consented to an entry is whether the allegedly consenting party would understand he or she was not free to enter the home in question without an officer. *See Harney v. City of Chicago*, 702 F.3d 916, 926 (7th Cir. 2012) (implied consent found where party was told he was under arrest prior to entering home)[4]; *Castellanos*, 518 F.3d at 970 (implied consent to enter home found where intoxicated defendant taken there by officers to retrieve identification); *United States v. Coulter*, 461 F.App'x 763, 767 (10th Cir. 2012) (implied consent found where homeowner entered home after officer advised her she could not enter home alone for safety reasons and she did not object to his entry).

[¶21]   Certain gestures by their very nature will provide clear evidence of consent. *See United States v. White*, 508 F.App'x 837, 841 (10th Cir. 2013) (implied consent found where officers asked homeowner where defendant was and homeowner led them into home and pointed upstairs); *United States v. Faler*, 832 F.3d 849, 853 (8th Cir. 2016) (implied consent found where apartment resident opened door wider in response to request to enter and pointed officers toward defendant).

[¶22]   Against this backdrop, we consider the district court's ruling. The district court made no specific findings concerning implied consent or the actions it relied on to find that Mr. Hawken consented to Trooper Undeberg's entry into the home. The district court did, however, cite the following facts in its decision letter, and it is these this Court will consider in determining whether the record supports the district court's ultimate finding of implied consent.

> Trooper Undeberg testified Mr. Hawken said he would get his wife and turned and walked toward the house. Trooper Undeberg followed. Mr. Hawken opened the door to what appeared to be a mudroom attached to the residence. The Trooper testified as he stepped into the mudroom, Mr. Hawken instructed him to "wait right here," and then said, "I'll be right back" as he was going through the door from the mudroom into the house. Trooper Undeberg remained in the mudroom as requested.

> At the hearing, the Trooper acknowledged Mr. Hawken did not specifically invite him into the mudroom. When asked on direct examination if Mr. Hawken had allowed "the door to slam in his face," the Trooper responded, "No, he did not."

---

[4] Like *Bashir*, *Harney* was a civil suit, but its posture did not affect the court's Fourth Amendment analysis.

7

[¶23] Mr. Hawken told Trooper Undeberg he would go get his wife, a statement that a reasonable person would interpret as a signal to wait for his return. Mr. Hawken did not invite the trooper to follow or invite him into the home, and Trooper Undeberg did not request permission to enter the home. Contrary to the State's assertion, there is no evidence that Mr. Hawken held the door open for the trooper. The only thing we know from the record is that he did not let the door slam in the trooper's face. That leaves other options. Given the State has the burden to prove consent by "clear and positive testimony," we are unwilling to draw the inferences the State argues from the limited testimony that was presented. *Johnson*, 2010 WY 47, ¶ 8, 228 P.3d at 1310; *see also Reed*, 920 N.W.2d at 67 ("Consent to a search should not . . . be lightly inferred.") (citing *United States v. Como*, 340 F.2d 891, 893 (2nd Cir. 1965)).[5]

[¶24] The facts in this case are like those in *Shaibu*, where no implied consent was found. 920 F.2d at 1427. In that case, officers were searching for a suspect in a bank fraud scheme, who they mistakenly believed resided at Mr. Shaibu's apartment. *Id*. at 1424. The officers rang Mr. Shaibu's apartment buzzer at the apartment complex entrance and were admitted into the complex. Mr. Shaibu came out of his apartment and walked toward the officers. The officers identified themselves and asked Mr. Shaibu if the suspect was in the apartment. Mr. Shaibu walked back into the apartment without replying, leaving the door open. Officers followed him in without asking permission or indicating they wanted to come in. *Id*. They found evidence of bank fraud in the apartment and charged him accordingly. *Id*. at 1425.

[¶25] On appeal, Mr. Shaibu argued that the evidence should have been suppressed because the officers did not have consent to enter the apartment. *Shaibu*, 920 F.2d at 1425. The court agreed. *Id*. at 1427. It relied on two factors in its decision: the officers never asked permission to enter, and Mr. Shaibu did not act affirmatively. *Id*. It said:

> [Mr. Shaibu] opened the door not to let the police enter, but only for himself to step out of the apartment to meet visitors outside rather than inside. There is no contention that the police expressly or impliedly asked consent to enter nor that Shaibu expressly granted or refused entry. It is one thing to infer consent from actions responding to a police request. It is quite another to sanction the police walking [into] a person's home without stopping at the door to ask permission. . . . To infer consent in this case is only a conjecture and would exceed the

---

[5] We note also that the district court did not draw the inferences the State is arguing from Trooper Undeberg's testimony. The court's findings were limited to a recitation of the facts to which the trooper testified or the court heard on the audio.

8

> scope of any recognized exception to the Fourth Amendment's
> bar to warrantless entry of the home.

*Id.*

[¶26]   The court's reasoning in *Shaibu* is persuasive. Like Mr. Shaibu, Mr. Hawken took no affirmative action to indicate he was inviting Trooper Undeberg into the house. He simply opened the door and entered. This is not clear evidence of consent. "We do not expect others to walk [into] our homes, even if the door is open, without first requesting permission to enter." *Shaibu*, 920 F.2d at 1427; *see also Bashir*, 445 F.3d at 1329 ("[C]onsent cannot reasonably be inferred from Bashir's simple act of disengaging from conversation with Sergeant Reed and walking into the house[.]").

[¶27]   The facts in this case also distinguish it from *Jones*, the primary case relied upon by both the district court and the State.[6] In *Jones*, officers followed Mr. Jones to his home from a store that sold products used in growing marijuana. 701 F.3d at 1304-05. Once out of their vehicles, one of the officers told Mr. Jones he was there for his marijuana and wanted to clear up what Mr. Jones had. *Id*. at 1305-06. The officer then indicated he wanted to search Mr. Jones's home. *Id*. at 1306. Mr. Jones turned and began walking toward his home, and the officers followed. They followed him into a screened porch and waited for him to unlock the back door. Mr. Jones entered and went through the kitchen and into the living room, and the officers again followed him. *Id*. He then turned to the officers with his palms up as if to say there was nothing to see. *Id*. at 1307. When one of the officers gave him a look to suggest he could smell the marijuana, Mr. Jones grabbed a gun, and the officers retreated. They later obtained a search warrant, and Mr. Jones was charged with marijuana and firearm offenses. *Id*.

[¶28]   On appeal, Mr. Jones argued the evidence against him should have been suppressed because the officers entered his home without consent. *Jones*, 701 F.3d at 1317. The Tenth Circuit cited the following factors as evidence that Mr. Jones gave implied consent: an officer indicated they wanted to search Mr. Jones's house, and Mr. Jones responded to the request by walking towards the house; he did not ask the officers why they were following him; he unlocked the back door with officers behind him; he did not try to stop officers, through words or otherwise, from following him into the house; and he made a gesture with his palms up once inside the house. *Id*. at 1320.

[¶29]   Unlike in *Jones*, Trooper Undeberg did not request or indicate a desire to enter the Hawken home. Because he did not, there was no request for Mr. Hawken to verbally refuse,

---

[6] The State also relies on our analysis of law enforcement's warrantless entry of a rental property in *Layland*, 2007 WY 188, ¶¶ 29-30, 171 P.3d at 1076-77. That reliance is misplaced because *Layland* was an action brought pursuant to 42 U.S.C. § 1983, and our analysis focused solely on whether an unequivocal rule of law put the officer on notice that his conduct would clearly be unlawful. *Id*. We did not evaluate the entry as we would have in reviewing a suppression ruling.

which was a significant factor in *Jones*. Likewise, because Trooper Undeberg did not request entry, Mr. Hawken's act of walking toward his house could not reasonably be interpreted as consent, as it was in *Jones*. At most, Mr. Hawken acquiesced in Trooper Undeberg following him to and into his home, and the Fourth Amendment does not permit an inference of consent from mere acquiescence. *Johnson*, 2010 WY 47, ¶ 8, 228 P.3d at 1310; *Shrum*, 908 F.3d at 1238.

[¶30]   We also reject the State's argument that Mr. Hawken provided consent when he told Trooper Undeberg, "Wait right here," as he entered the mudroom. It is difficult to understand how an officer may reasonably infer he has consent to enter a premises based on conduct that occurs after the entry. More importantly, the law requires that consent be obtained before entering a protected area. *Mickelson*, 906 P.2d at 1022 ("[E]fforts to establish consent via post hoc colloquy with the owner ran afoul of the proposition that such action must be 'justified at its inception . . . .'") (quoting *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)); *see also Shrum*, 908 F.3d at 1232 ("The initial legality of a [search] turns on the facts and circumstances known to the police at the time of the [search] rather than on facts and circumstances subsequently discovered."); *State v. Ellis*, 210 P.3d 144, 153 (Mont. 2009) ("[T]o be valid and qualify as an exception to the warrant requirement, a consent must *precede* a search.") (emphasis in original). Trooper Undeberg needed a warrant or implied or express consent before crossing the threshold of the Hawken home. He had neither, and therefore nothing that occurred after his entry is relevant to our inquiry.

[¶31]   In *Jones*, officers had nonverbal conduct from which they could reasonably infer consent to enter the home. Specifically, an officer indicated the officers wanted to search his home, and Mr. Jones responded by walking to his home with the officers in tow. *Jones*, 701 F.3d at 1320. Allowing the officers to follow him through the home and his hand gestures merely confirmed that Mr. Jones expected and consented to their presence in the home. *Id*. We do not agree that a reasonable officer would have interpreted Mr. Hawken's order to "wait right here," given as Trooper Undeberg was crossing the threshold, as consent to be in the Hawken home—particularly since Mr. Hawken had earlier said he would go get Ms. Hawken. Under the circumstances, "wait right here" is more reasonably interpreted as either a rebuke of the trooper's uninvited presence, or at best, acquiescence.

[¶32]   Trooper Undeberg did not have a warrant to enter the Hawken home, and his entry was therefore presumptively unreasonable. *Fuller*, 2021 WY 36, ¶ 9, 481 P.3d at 1133. To overcome the presumption that Trooper Undeberg's warrantless entry of the Hawken home was unreasonable, the State had to prove, based on the totality of the circumstances and with clear evidence, that a reasonable officer would have believed Mr. Hawken consented to his entry. *Castellanos*, 518 F.3d at 969-70; *O'Boyle*, 2005 WY 83, ¶ 60, 117 P.3d at 418. While we accept the district court's findings of basic fact, we do not agree with its ultimate conclusion that the State met its burden. As a matter of law, the facts the State proved, and the district court found, do not add up to implied consent. *See Castellanos*, 518 F.3d at 972

(noting court was not disturbing findings of credibility or fact but rather the application of law to those findings).

[¶33] Because the State did not meet its burden, we must conclude that Trooper Undeberg's entry into the Hawken home violated the Fourth Amendment. We therefore turn to the question of whether the exclusionary rule requires suppression of the evidence against Ms. Hawken.

## II. The record is not sufficiently developed for our review of the suppression issue, and we therefore remand.

[¶34] After Trooper Undeberg unlawfully entered the Hawken home, Ms. Hawken consented to leaving her home, getting into his patrol car, and talking with him. This led to her arrest and breathalyzer test, which revealed a blood alcohol content of .260%. At this stage of our analysis, the question is whether Trooper Undeberg's unlawful entry of the Hawken home tainted the evidence his ensuing investigation produced, thus requiring its suppression. *Campbell v. State*, 2014 WY 156, ¶ 31, 339 P.3d 258, 265 (Wyo. 2014).[7]

[¶35] "Under the exclusionary rule, evidence obtained in violation of an individual's Fourth Amendment rights cannot be used against them in a criminal proceeding." *Barney v. State*, 2022 WY 49, ¶ 27, 507 P.3d 459, 464 (Wyo. 2022) (citing *United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974)). A defendant has the initial burden of establishing a causal connection between illegal police action and the evidence he seeks to suppress. *Shrum*, 908 F.3d at 1233 (citing *United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006)). "Specifically, the defendant must establish the incriminating evidence 'would not have come to light *but for* the illegal [search].'" *Id*. (quoting *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). A defendant's "but for" showing does not end the inquiry. *Id*. If a defendant makes the required showing, the burden shifts to the government to prove that an exception to the exclusionary rule applies. *Id*.

[¶36] There are three exceptions to the exclusionary rule: the independent source doctrine; the inevitable discovery doctrine; and the attenuation doctrine. *Utah v. Strieff*, 579 U.S. 232, 238, 136 S.Ct. 2056, 2061, 195 L.Ed.2d 400 (2016). Before the district court, the State made no reference to either of the first two exceptions and seemed to rely on the attenuation doctrine, so that is the exception we will look to.

---

[7] The unlawfulness of Trooper Undeberg's entry of the Hawken home has no effect on the admissibility of the evidence against Ms. Hawken in the probation revocation proceeding. *Panesenko v. State*, 706 P.2d 273, 275 (Wyo. 1985) ("The great majority of courts which have ruled on this question have held that evidence obtained by illegal search and seizure is admissible in a probation revocation hearing even though it would be inadmissible in a criminal prosecution.") (quoting *Gronski v. State*, 700 P.2d 777, 779 (Wyo. 1985)).

[¶37] Under the attenuation doctrine, "evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Barney*, 2022 WY 49, ¶ 28, 507 P.3d at 464 (quoting *Strieff*, 579 U.S. at 238, 136 S.Ct. at 2061) (internal quotation marks omitted).

> The notion of attenuation or "'dissipation of the taint' of the prior illegality attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost."

*Shrum*, 908 F.3d at 1235 (cleaned up) (quoting *Brown v. Illinois*, 422 U.S. 590, 609, 95 S.Ct. 2254, 2264, 45 L.Ed.2d 416 (1975) (Powell, J., concurring in part)).

[¶38] We consider three factors in determining whether the attenuation doctrine applies.

> The first factor examines the temporal proximity between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional conduct. The second factor considers the presence of intervening circumstances. The third factor examines the purpose and flagrancy of the official misconduct.

*Barney*, 2022 WY 49, ¶ 29, 507 P.3d at 464 (cleaned up).

[¶39] The district court made no alternative findings as to the applicability of the attenuation doctrine, and understandably so. The record is scant as to its applicability. Trooper Undeberg testified that while he was waiting for Mr. Hawken to retrieve Ms. Hawken, he heard the two of them talking, with Mr. Hawken cussing and yelling at Ms. Hawken, "The sheriffs are here. You need to go out and talk to them. You need to go outside and talk to them. They're here." He further testified:

> When Mr. Hawken and [Ms. Hawken] started to have that verbal argument, it sounded to me like it was escalating, so I asked Mr. Hawken through the closed door, I yelled at him to come back out there to talk to me, because I didn't want them to end up in an altercation inside of the house.

[¶40] In response, Mr. Hawken returned to the mudroom, followed by Ms. Hawken. At that point, Trooper Undeberg addressed Ms. Hawken for the first time. He testified:

A.    I told her I needed her to come outside with me and come out to my car so we could discuss what happened with her car as far as the crash and her car being left in the ditch.

Q.    . . . . And when you asked her to come outside with you, what did she say?

A.    I don't recall. Um, there was some confusion in the conversation there. Um, when I had asked her to come outside, there was – I don't recall any immediate verbal response and then [Mr. Hawken] interjected himself and – and conversed about who had given her a ride home and told her she needed to go outside with me. There was a long back and forth conversation between her and [Mr. Hawken] at that time.

Q.    Did you, in any way, force Ms. Hawken to come outside with you?

A.    No, I did not.

Q.    And, um, in fact, did she stop to put some shoes or boots on before she came outside?

A.    Yeah. She did not have shoes on. I believe she put a pair of muck boots on, if I recall correctly.

Q.    . . . And did [Ms. Hawken] walk out to your car on her own?

A.    There was some assistance just to help her maintain her balance, but, yes, she did walk out on her own.

Q.    And then at that point, did you do your investigation into, um – into the accident?

A.    Yes, I did.

Q.    And, ultimately, did you arrest the defendant for driving under the influence?

A.    Yes, I did.

13

Q. Was she taken to the detention center and, um, had a test of her breath?

A. That is correct, yes.

Q. And the results?

A. I believe – without referencing my report, I believe that she was .26 on the breath test.

[¶41] The record leaves questions as to Ms. Hawken's required "but for" showing. It appears that Mr. Hawken brought considerable pressure to bear on Ms. Hawken to get her to face law enforcement. Would Ms. Hawken have inevitably left the home to talk with Trooper Undeberg because of her husband's independent urging? Would Mr. Hawken have been as adamant if Trooper Undeberg were not in the home? Was it her husband's pressure that caused Ms. Hawken to enter the mudroom, or was it Trooper Undeberg's yelling to her husband to return to the mudroom? These are factual questions that must be resolved to determine whether Ms. Hawken has met her burden of showing that but for Trooper Undeberg's entry, she would not have consented to his seizure and questioning.

[¶42] As to application of the attenuation doctrine, the only factor we can weigh with certainty based on the present record is the temporal proximity between the unconstitutional conduct and the discovery of evidence that supported charges against Ms. Hawken. To weigh against suppression, the time between the two had to be "substantial." *Barney*, 2022 WY 49, ¶ 30, 507 P.3d at 464 (quoting *Strieff*, 579 U.S. at 239, 136 S.Ct. at 2062). In *Barney*, we held a lapse of two hours was not substantial and that the temporal proximity factor weighed in favor of suppression. *Id*. Here, the time was minutes. This factor plainly weighs in favor of suppression.

[¶43] The remaining factors are less certain. When Ms. Hawken entered the mudroom, she was intoxicated and was immediately met by Trooper Undeberg, who testified that he used a "somewhat firm tone," when he told her "I needed to speak with her about her crash, and I needed her to come out to my car." Ms. Hawken complied. Whether this consent constituted an intervening event that weighs against suppression, however, depends on whether it was truly an act of free will. *United States v. Smith*, 919 F.3d 1, 11 (1st Cir. 2019) ("The presence of intervening circumstances that provide the defendant an opportunity to pause and reflect, to decline consent, or to revoke consent help demonstrate that the illegality was attenuated.") (quoting *United States v. Whisenton*, 765 F.3d 938, 942 (8th Cir. 2014)). We explained in *Campbell*:

> When a consensual search follows a Fourth Amendment violation, the government must prove not only that the defendant's consent was voluntary in the sense that his will

was not overborne by police coercion, but also that pressures resulting from the initial constitutional violation had diminished and were no longer so great as to prevent him from acting with a degree of free will sufficient to purge his consent of the taint of that violation.

*Campbell*, 2014 WY 156, ¶ 31, 339 P.3d at 265 (citing 4 Wayne R. LaFave, *Search and Seizure* § 8.2(d) (5th ed. 2014 update)); *see also Shrum*, 908 F.3d at 1238 ("Well established precedent teaches us that the question here is not only whether Defendant's consent was voluntary but also whether his consent was 'an act of free will sufficient to purge the primary taint of the unlawful invasion.'") (quoting *Kaupp v. Texas*, 538 U.S. 626, 632, 123 S.Ct. 1843, 1847, 155 L.Ed.2d 814 (2003)).

[¶44] Also relevant to this inquiry is any advisement Ms. Hawken was given, *see Whisenton*, 765 F.3d at 942; *United States v. Delancy*, 502 F.3d 1297, 1311 (11th Cir. 2007), and whether her intoxication prevented her from providing a knowing consent. *United States v. Gay*, 774 F.2d 368, 377 (10th Cir. 1985) ("The issue squarely put is whether Gay was so intoxicated that his consent to search was not the product of a rational intellect and a free will."); *see also United States v. Sims*, 428 F.3d 945, 953 (10th Cir. 2005) ("[T]he most troubling issue is whether, given Sims's mental condition, his consent was nonetheless the 'product of a rational intellect and a free will' and made with a 'mental awareness so that the act of consent was that of one who knew what he was doing.'").

[¶45] The record does not tell us what, if any, advisements, including *Miranda*, Trooper Undeberg gave Ms. Hawken, and when those were given. It also does not provide sufficient evidence of Ms. Hawken's level of intoxication to allow a determination of whether she could knowingly consent to the Trooper's requests. Thus, whether her consent was an act of free will, and free from the pressure of Trooper Undeberg's unlawful entry, is a question best answered in the first instance by the district court. *Campbell*, 2014 WY 156, ¶ 34, 339 P.3d at 266; *see also United States v. Melendez–Garcia*, 28 F.3d 1046, 1055 (10th Cir. 1994) ("The district court is in a better position to reconstruct the circumstances of the consent.").

[¶46] The third factor, the purpose and flagrancy of the official misconduct, is likewise a factor we cannot weigh based on the present record. "Purposeful and flagrant misconduct is not limited to situations where police act in an outright threatening or coercive manner." *United States v. Fox*, 600 F.3d 1253, 1261 (10th Cir. 2010) (quoting *United States v. Reed*, 349 F.3d 457, 465 (7th Cir. 2003)) (internal alterations omitted). Instead:

Purposeful and flagrant misconduct is generally found where: (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the

15

> misconduct was investigatory in design and purpose and executed in the hope that something might turn up.

*Barney*, 2022 WY 49, ¶ 38, 507 P.3d at 466 (quoting *Fox*, 600 F.3d at 1261) (cleaned up).

[¶47]  This is an inquiry best left to the district court in the first instance. Our law is well established that an officer may not enter a home without a warrant or consent. The record does not reflect whether it was obvious to Trooper Undeberg that he did not have consent or that he knew he was crossing a line. Additionally, while Trooper Undeberg's intrusion was slight and of a short duration, he remained in the mudroom when Ms. Hawken appeared. Whether his entry and decision to stay in the mudroom after Ms. Hawken appeared were actions that were investigatory in design and purpose are questions we likewise cannot answer based on the record before us and are best left to the district court.

## CONCLUSION

[¶48]  The district court erred in concluding that Trooper Undeberg had implied consent to enter the Hawken home, and his entry therefore violated the Fourth Amendment. We reverse and remand for a determination of whether the unlawful intrusion requires suppression of the evidence against Ms. Hawken.[8]

---

[8] In *Campbell*, we remanded for consideration of the suppression question because the district court did not reach it after erroneously concluding the search in that case was constitutional and the record had not been developed sufficiently for this Court to decide the question in the first instance. 2014 WY 156, ¶ 34, 339 P.3d at 266. In doing so, we relied on Tenth Circuit precedent, and it is apparently common practice for that court to remand cases for that determination. *See Shrum*, 908 F.3d at 1240 (Eid, J., concurring in part and dissenting in part) ("It is the general practice of this court to remand for determination of such issues."). This case makes us question that practice. The practice leads to multiple hearings, with the remand hearing potentially occurring years after the events in question, when memories are unlikely to be as fresh, and has the potential to lead to piecemeal appeals. We thus encourage parties to meet the entirety of their respective burdens of proof in the initial suppression hearing. *See United States v. Achana-Suaso*, 568 F.App'x 627, 632 (10th Cir. 2014) ("We do 'not invite an open season for the government to make the record that it failed to make in the first instance.'") (quoting *United States v. Forsythe*, 437 F.3d 960, 963-64 (10th Cir. 2005)).